(No. 26118.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRED H. REITER *et al.* Plaintiffs in Error.

*Opinion filed June 17, 1941.*

SHAW, J., took no part.

MANUS & MANUS, and HEARD & WILSON, (ALBERT H. MANUS, of counsel,) for plaintiffs in error.

GEORGE F. BARRETT, Attorney General, (ROBERT J. ELLIS, State's Attorney, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

This is a writ of error to review a judgment of conviction in the circuit court of Stephenson county against plaintiffs in error, hereinafter referred to as the defendants, on a charge of falsifying certain records of the office of supervisor of the town of Freeport.

Numerous errors are assigned. The statute under which defendants were convicted, so far as material here, reads as follows: "If any judge, justice of the peace, sheriff, coroner, clerk, recorder, or other public officer, or any person whatsoever, * * * shall alter, deface or falsify any minute, document, book, or any proceeding whatever, of or belonging to any public office within this State, the person so offending shall be imprisoned in the penitentiary not less than one nor more than seven years." Ill. Rev. Stat. 1939, chap. 38, par. 401.

The indictment consisted of five counts, some charging that defendants "corrupted and falsified a certain record and document called a voucher" in the manner therein described, and other counts charging that defendants "corrupted and falsified a certain record and document called a supervisor's card." The indictment also charges that the falsification of these records was for the purpose of paying defendant Poling, a doctor, for services to individuals who were not then relief clients of the town of Freeport and who had not then asked for any medical assistance.

There is little dispute as to the facts. The argument arises over the conclusion to be drawn from them. The evidence is undisputed that at the time of the acts complained of, to-wit, January 12 and 13, 1939, relief was administered in the town of Freeport both by the use of township funds and with State funds furnished through the Illinois Emergency Relief Commission. The evidence, without dispute, also is that relief in the town of Freeport administered from township funds was separate and distinct from that administered from funds furnished by the so-called "I.E.R.C." Cases relieved by the use of township funds were so-called "welfare" cases, meaning persons permanently unemployable, temporary relief cases, emergency cases and institutional cases. The funds furnished through the I.E.R.C. were used largely to help individuals

who were employable but unemployed. The evidence is that all cases handled by the I.E.R.C. were handled through case workers who investigated and made voluminous reports, while those cared for by the supervisor, using township funds, were administered without case workers, if the supervisor knew of the financial condition of the applicant, and that this custom had been observed by the supervisor for many years.

The sections of the statute regulating the duties of the township supervisor as to the care of town charges, in effect between 1934, when defendant Reiter took office, up to the time of the filing of the indictment, were sections 15, 20, 23 and 24 of chapter 107 of the statutes of 1933, known as the Pauper. act. Those sections provided that in townships under township organization the town shall relieve and support all poor and indigent persons. The overseer of the poor is charged with the care and oversight of all such persons in the town or precinct as are unable to earn a livelihood in consequence of any bodily or mental infirmity, or other unavoidable cause, where such are not supported by the relatives or in the county poorhouse. Those sections required the overseer to see that such persons were suitably relieved, supported and employed. Section 23 provided that when any poor or indigent person does not require support wholly by the county, the overseer of the poor or supervisor might, subject to such limitations as may be prescribed by the county board or board of town auditors, render him temporary relief without his being committed to the care of any such person or being sent to the county poorhouse. Section 24 provided that when persons not coming within the definition of a pauper, shall fall sick, and shall not have money or property to pay for their care, "the overseer or overseers of the poor of the town or precinct in which he may be shall give, or cause to be given to him such assistance as they may deem necessary and proper," etc.

Since the early case of *County of Kankakee* v. *McGrew*, 178 Ill. 74, it has been the law in this State that an overseer of the poor may relieve the residents of the town in destitute circumstances, and if there are no funds on hand for the purpose, he may pledge the credit of the town, and, in the absence of fraud, the town will be held liable without proof that the persons supplied were legally public charges. It was in that case held that the determination by the overseer of the poor as to who are entitled to relief, is an official act binding upon the town. To like effect is *County of Perry* v. *City of DuQuoin*, 99 Ill. 479.

The powers and duties of the Illinois Emergency Relief Commission at the time in question here, were described by chapter 23 of our statutes. (Ill. Rev. Stat. 1935, chap. 23, pars. 393, 394.) There was nothing in those paragraphs to indicate any change in the law concerning the powers of the overseer or the administration of relief by towns. By amendments in 1937, (Ill. Rev. Stat. 1937, chap. 23,) allocation of State funds to local governmental units was directed, but the commission was then given no supervision over local governing units, except that the county board in each county was required to submit to the commission an itemized statement showing the relief necessary to be furnished and the expense of the administration thereof for the period therein provided. The 1937 amendments also provided that funds of the State so allocated be used "exclusively for the furnishing of assistance to persons in destitute and necessitous circumstances and for the payment of expenses necessarily incurred in the administration of such relief in such counties." (Ill. Rev. Stat. 1937, chap. 23, par. 394.) There is nothing in this act which gave the commission power to prescribe rules for the administration of funds for relief purposes by local units. Such power did not come into existence until the amendment of this section in 1939, (Ill. Rev. Stat. 1939, chap. 23, par. 394,) so it is clear that during the period

in which the subject matter of this complaint arose, relief provided by the use of township funds in townships such as here involved, was wholly under the control of the supervisor as overseer of the poor.

An examination of the statutes concerning the duties of the supervisor discloses no particular method by which he shall keep the records of his office. Section 4 of article 11 of the Township Organization act (Ill. Rev. Stat. 1939, chap. 139, par. 103, p. 3142) then provided, and now provides, that the supervisor "shall keep a just and true account of the receipts and expenditures of all moneys which shall come into his hands by virtue of his office, in a book to be provided for that purpose at the expense of the town; and said book shall be delivered to his successor in office." There is nothing in the statute requiring the keeping of these accounts on cards, as was done and had been done in this township for many years, and plaintiffs in error argue that, therefore, these cards cannot be said to be official records. They were, however, by the custom there in existence, the method by which the account of expenditures of emergency relief funds of the township were kept. They were records of his office. Whatever the nature of the records kept, they were kept entirely under the supervision of the supervisor, and under no other authority.

The gist of the offense charged here is that defendant Reiter, as supervisor, and defendant Poling, a doctor, falsified these cards to show services rendered by Dr. Poling and charged against the township relief funds as relief, when in fact no such relief was then being asked for or required. Three cases are by different counts of the indictment specified. One is known in the record as the Harlacher family. In that case services were rendered to a child for a broken arm, in 1933. Another case specified was the Jacobs family, treated for scarlet fever, in 1934, and the third was the Viney family, of which the wife was operated on by defendant Poling in 1936. The un-

disputed evidence of the defense is as to the Harlacher case, that the child was taken to Dr. Poling with a broken arm; that Dr. Poling reduced the fracture and put on a plaster cast, and at that time spoke to the former supervisor, Gibler, concerning the payment for this treatment on the ground that these people were unable to pay for it, and that the supervisor told him to attempt to get the payment from the Harlachers and if he could not do so, the supervisor would pay the bill. It is admitted nothing was ever paid on the bill and that the Harlacher family were unable to pay. The evidence is that defendant Poling sent bills in an endeavor to collect; that when defendant Reiter assumed office in 1934, Dr. Poling explained to him that his predecessor had guaranteed payment of the bill by the township and defendant Reiter testified that he too "O.K.'d" the bill and told Poling that if the Harlachers did not pay, the township would.

The undisputed facts as to the Jacobs family are that they were in quarantine afflicted with scarlet fever in 1934. Defendant Poling was called to attend them for a period of about three weeks. The father, John Jacobs, was not at home. Subsequently, defendant Poling treated Mrs. Jacobs for stomach and liver trouble. The evidence is that when first called in to attend the Jacobs family, defendant Poling consulted with the supervisor Reiter and was told to attempt to get his fees from the family and if he could not do so the town would pay. Defendant Reiter testified as to this account, and he is undisputed, that he knew the Jacobs family and knew that they were unable to pay the bill. The evidence is that Dr. Poling succeeded in collecting the sum of $6 on this bill by sending several statements. It is undisputed that the Jacobs family were unable to pay more.

The undisputed facts as to the Viney case are that in February, 1936, Maude Viney went to see defendant Poling, who had been their family physician for about nineteen

years; that he examined her and told her she would have to have an operation and sent her to the hospital, where he operated and treated her, and treated her at her home subsequently; that before sending her to the hospital, he talked to defendant Reiter, supervisor, about the Viney case, and was told by him that he knew the Vineys could not pay and that if they didn't pay, the township would. It is admitted the Vineys never paid anything on the bill and that there never had been a time since the operation when they were able to pay.

The undisputed testimony is that in this township the custom had prevailed for years for a doctor, in cases where the patient who called him was unable to pay for his services, to call up the supervisor, tell him of the case and the supervisor would either tell him to go ahead, if the financial condition of the patient was known to that officer to be such as to require public aid, or would require the doctor to wait until an investigation had been made, unless the case was an emergency. That such was, and had been, the custom followed by physicians generally in pauper cases, was shown by the testimony of two reputable physicians.

It appears from the evidence that in December, 1939, complaint was made of the administration of relief funds in the city of Freeport and State investigators were sent there who called upon the defendant Reiter, and on being invited to go through his office, found and took away the cards and vouchers relating to the Harlacher, Jacobs and Viney cases. The claimed falsification of the record is that in the use of a printed form of card which contained the words and blanks: "Let ....... have ....... dollars in medical care and charge to the Town of Freeport;" that defendants had made them out as of January 12, 1939, to show medical service currently rendered in these three cases, whereas the services were rendered years before, and the card was thus falsified to cause an old bill, which the town would not be required to pay, to appear to be

a current bill. The bill of defendant Poling attached to the voucher in these cases was dated January 14, 1939, and was for "balance due for professional services." The total of his charges for the three cases amounted to $90.50. The testimony, undisputed, is that it was, and had for years been, the custom in that township for the doctors rendering aid to paupers to submit their bills after the services were rendered and that the supervisor's card authorizing the services was filled out at the time the bill was submitted. While such a practice may not meet the approval of the most orderly mind, no statute prohibiting such practice has been called to our attention. It is not argued by the People that such a practice is illegal, subjecting the supervisor and doctor to penalties under the criminal law, but it is argued that by this practice, as used in this case, defendant Poling was able to collect and did collect an old and uncollectible bill. It is admitted in this record by those receiving the services, that the same were received. There is no dispute of the fact that these were proper cases for care. There is no dispute of the fact that at the time the services were rendered defendant Poling secured the assurance of the defendant supervisor that if he could not collect, the township would pay for his services. The law is clear that the supervisor had power to bind the township for such services, and these things being true, there can be no doubt, under the evidence in this record, that these were bills for which the township was liable. The fact that they were not presented for some years after they were incurred, does not affect the liability of the township to pay them, and they cannot be said to be, for that reason, bills for which the township was not liable. There is no claim here that these bills were not proper charges against the township when the services were rendered.

It is charged in the indictment that they purported to be for assistance that was not asked for and those receiving

that assistance testified for the People that they had not asked the supervisor for help. The record shows without dispute, however, that the doctor, before rendering the services, asked the supervisor to "O.K." them and that the supervisor did so and agreed to pay them if the doctor could not collect them. Under these circumstances the fact that the recipients did not ask the supervisor for aid, in nowise affected the validity of the claims against the township. The giving of the services is admitted, and the recipients admitted on the witness stand that they did not and could not pay for them.

The People argue here that there was no difference under the statute in the manner of administering funds for needy under the I.E.R.C. and those raised by taxation in the township, but that both were to be administered under rules of the I.E.R.C. We have seen, however, that during the period involved here, the funds were separate and separately administered. This conclusion of the People is not correct as applied at the time involved in these proceedings. At that time the commission had no supervision over the administration of township funds and there was no provision in the statute requiring that the supervisor appoint investigators or case workers before giving relief. Nevertheless, on the trial of the case, counsel for the People asked one of the investigators for the State whether there was a uniform system in the administration of relief in the State of Illinois by local units relative to the employment of case workers, and their duties as prescribed by the I.E.R.C. Objection to this question was overruled. The witness answered that there were uniform rules applicable to all units in the State, fixing the administration of all relief funds and the duties of case workers. Again, on the hearing, the People objected to questions asked by counsel for the defense concerning the custom in effect in the office of the defendant Reiter, on the ground that the statute provides what the procedure should be and that

there is no distinction between township funds and I.E.R.C. funds. The question asked by the People's counsel was erroneous for two reasons,—first, it called for a conclusion as to what the law was, and second, it brought before the jury evidence that at the time involved in this case an overseer of the poor was required to follow certain rules laid down by the I.E.R.C. in the administration of relief. Such was not the law and the effect of that question and answer upon the jury could only have been to cause them to understand that here were acts granting relief contrary to law. The objection should have been sustained and it was prejudicial error to overrule it.

The only basis for complaint which the People have in the method of the payment of these bills, lies in the fact that the record made by the supervisor did not identify the bills as old bills, though the bills presented by defendant Poling were for balance due and indicated that they were not current bills. The most that can be said of such matter is that it would amount to an irregularity. These bills, as shown by this record, were due from the township and the fact that defendant Poling, who stated on the witness stand that he was a poor bill-collector and did not present bills for some years after they had accrued, did not, as we have seen, remove liability on the part of the township.

The People argue there was no investigation of those cases. It is not denied that they were emergency cases. The defendant Reiter testified that he knew the people were unable to pay. There was nothing in the statute as then in force, requiring an investigation in such cases. The statute did require that the supervisor be acquainted with the facts and that he give relief only to the needy. If he knew, as he testified he knew, that those were needy cases, there was nothing in the statute requiring that he, in addition, make an investigation.

We are unable to see wherein it can be said that this record shows that these defendants have been guilty of falsifying records as charged in the indictment.

Numerous other questions have been raised concerning the sufficiency of the indictment, lack of any proof as to defendant Poling and the validity of the act. As we are of the opinion that under this record this conviction can not stand, it is unnecessary to consider other objections.

The judgment of the circuit court is reversed.

*Judgment reversed.*

Mr. JUSTICE SHAW took no part in this decision.