(No. 26683.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DENNIS KELLY *et al.*— (DENNIS KELLY, Plaintiff in Error.)

*Opinion filed September 21, 1942—Rehearing denied Nov. 11, 1942.*

590

WM. SCOTT STEWART, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and JAMES E. BURKE, State's Attorney, for the People.

Mr. JUSTICE MURPHY delivered the opinion of the court:

Dennis Kelly, plaintiff in error, and Evelyn Welch were convicted of conspiracy in a jury trial in the circuit court of Will county. Motions for a new trial and in arrest of judgment were overruled. Kelly was committed to the county jail for one year and assessed a fine of $1000. Evelyn Welch was fined $100. The Appellate Court affirmed Kelly's conviction and he prosecutes this writ of error. The case of Evelyn Welch was not before the Appellate Court.

The specific charge in the indictment was conspiracy to obstruct the administration of justice by corrupting Raymond Peterson who was one of a panel of jurors then summoned for service in the circuit court of that county. One of the cases on the trial calendar to be called during

Peterson's jury service was an indictment charging plaintiff in error with illegal voting.

Aside from a large number of character witnesses who testified for plaintiff in error and Welch, there are four persons upon whose testimony the result of the case depended. The juror Raymond Peterson and his brother Robert Peterson were called on behalf of the People, and plaintiff in error and his co-defendant Welch testified in their own behalf. Raymond Peterson was an employee of a bank in Chicago and his brother Robert Peterson had, sometime previous to the act in question, been employed as a laborer on WPA. Plaintiff in error was business manager of a local union and Miss Welch was its secretary. The Petersons and plaintiff in error had no acquaintance prior to January 1, 1940. Robert Peterson had a previous acquaintance with Evelyn Welch.

On January 1, 1940, plaintiff in error and Welch drove to the home of Robert Peterson in Lockport. The evidence accounting for their call is in sharp conflict. Robert Peterson testified they came unsolicited, while plaintiff in error and Miss Welch testified they went there in response to a telephone call from Robert Peterson to Miss Welch, in which he said he had some important information that he would like to convey to plaintiff in error which could not be given over the telephone. The evidence as to the conversation between Robert Peterson and plaintiff in error and Welch is also conflicting. Robert Peterson testified that Miss Welch came into his home and at his request she called plaintiff in error who had been waiting outside. He stated that there was discussion about his (Peterson's) employment, that he told plaintiff in error that he had previously been employed on the WPA but was then on "straight relief" and he says he asked plaintiff in error if he would do him a favor by getting him better employment on the WPA, to which plaintiff in error replied that he obtain reinstatement on WPA and then come and see

him. He stated that plaintiff in error asked if his brother was going to serve on the jury, and that when he phoned Raymond to arrange the meeting the next day, he told Raymony that Kelly wanted to see him about his jury service. On cross-examination he admitted such statement was made on his own initiative and that his thought was that if that could be injected in the purpose for a meeting between plaintiff in error and Raymond that he would be in better position to ask for a favor from plaintiff in error in obtaining employment on the WPA. Plaintiff in error and Miss Welch testified that she entered the Peterson home but that plaintiff in error did not go in and did not have any conversation with Peterson that evening. She testified that Robert Peterson told her that the information he had was from his brother Raymond and that Raymond wished to talk with plaintiff in error. She stated that after waiting about thirty minutes for Raymond to come, she left.

Plaintiff in error and Welch returned to the Robert Peterson home the next day and soon after their arrival Raymond Peterson came. Those present at this meeting were Raymond Peterson, plaintiff in error and Miss Welch. Peterson testified that plaintiff in error told him that he wished him to stay on the jury and "if there was any difference in the pay I would get down here and up at work, that he would make it good. Then he said that he had seen my brother and he started talking about that he was off the WPA now, and maybe he could get back on, and maybe he could get him a pretty good job if he got back. Then he went ahead and explained the case to me. He said the average citizen doesn't understand the case like this. He said he would like to have me go along with him * * * he said maybe sometime he could do me a favor." Plaintiff in error testified that Raymond Peterson opened the conversation about his jury service by saying "I am going to be on that jury that is coming up and your trial is called. If you can do me some good, I will do some good

for you." To which plaintiff in error replied that he did not want any part in such a transaction, and says that he told Peterson that "If you are called for jury service you should know better than to talk to me." Miss Welch corroborates plaintiff in error in this regard.

Errors urged as grounds for reversal included errors in the giving of instructions and rulings on evidence. Objection is made to instruction number 12, tendered by the People, the complaint being that the language of the instruction would lead the jury to believe that the court looked upon the character evidence of plaintiff in error with suspicion. The part of the instruction to which the objection is made told the jury that if, from all the evidence in the case, it was satisfied beyond a reasonable doubt of the guilt of the defendants, then it was "the duty of the jury to find them guilty notwithstanding the fact, if it be a fact, that heretofore the said accused have borne a good reputation for the aforesaid traits." It is true the evidence of good reputation offered by the plaintiff in error was not contradicted but there was nothing in the instruction that subjects it to the criticism made. Plaintiff in error relies upon *People* v. *Biella,* 374 Ill. 87, but a comparison of the instruction in that case and the one in the instant case shows the inapplicability of that case as authority on this point.

The defendants tendered instructions with reference to the testimony of an accomplice, all of which were refused. The court gave in lieu thereof, an instruction containing three paragraphs. The first defined an accomplice, the second told the jury that if it found that any witness in the case was an accomplice under the definition given, then the testimony of such accomplice was subject to grave suspicion and should be acted upon with great care and caution. The third paragraph was as follows:

"If the testimony of an accomplice carries conviction and the jury are convinced of its truth beyond a reasonable doubt they should give it the same weight as would be

given to the testimony of a witness who is in no respect implicated in the offense and the credibility of such an accomplice is for the jury to pass upon as they pass on the credibility of any other witness."

The evidence of Robert Peterson tends to show that he talked to plaintiff in error and Welch with a view of receiving help from plaintiff in error in obtaining employment on WPA and that Raymond's jury service was brought into it by him for the purpose of strengthening his position with plaintiff in error. Under such circumstances he was conspiring with plaintiff in error to corrupt Raymond in his jury service, expecting to receive benefit from it. This was sufficient to constitute him an accomplice. (*People* v. *Hrdlicka,* 344 Ill. 211.) Although plaintiff in error's defense was founded on a theory that did not involve Robert Peterson as an accomplice, yet since Peterson's own evidence makes him an accomplice, plaintiff in error had the right to have the jury correctly instructed as to how to determine the credit to be attached to his testimony. It will be noted that the third paragraph of the instruction deals with two principles; one as to how the jury should consider the testimony of an accomplice if it were convinced beyond a reasonable doubt of its truthfulness; the other as to the measure it should adopt in determining the credit to be attached to such testimony. The effect of it was to tell the jury that the credibility of an accomplice was to be determined by the same test that would be applied in determining the credibility of any other witness.

The instruction did not state the law correctly. The testimony of an accomplice is competent and a jury may convict on the uncorroborated testimony of an accomplice, if it is satisfied as to guilt beyond a reasonable doubt. However, the credit to be attached to the testimony of an accomplice can not be determined by the same test by which the credibility of other witnesses is determined. It must be carefully considered by the jury in the light of all the other

evidence in the case, also the influence upon which the testimony is given and whether the purpose of the witness was to shield himself from punishment or obtain some benefit for him. *People* v. *Rongetti,* 338 Ill. 56; *People* v. *Elmore,* 318 id. 276; *People* v. *McKinney,* 267 id. 454.

Defendant in error contends that even though the instruction did not state the law correctly, it could not, under the facts shown, have prejudiced the jury. The evidence out of which the essential elements of the crime arise is in such sharp conflict that the jury should have been properly instructed as to the law. The credit to be given the testimony of the accomplice was of controlling importance. It is not a case where the rule contended for by defendant in error can be applied.

The error assigned on admissibility of evidence arises out of an offer of proof made by plaintiff in error, in which he endeavored to show that the evidence which the People would rely upon in prosecuting plaintiff in error upon the charge of illegal voting was such that a case could not be established against him. He also asked to introduce evidence showing that in a previous trial the evidence was so deficient that the court directed a verdict of not guilty. The introduction of such evidence would have injected into this case the issues that were to be tried in the other cases. They were matters foreign to the issue and were properly refused.

Other errors were assigned which have been considered and are found to be without merit. The errors which plaintiff in error assigned, but which were not briefed or argued, will be deemed to have been waived.

For the reasons assigned, the judgments of the Appellate Court and of the circuit court are reversed and the cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*