THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MOHAMMED SKIKADA MOSTAFA, Defendant-Appellant.

(No. 55463;

First District—September 7, 1971.

*Rehearing denied September 30, 1971.*

Bellows, Bellows & Magidson, of Chicago, for appellant.

William J. Scott, Attorney General, of Springfield, and Edward V. Hanrahan, State's Attorney, of Chicago, (James B. Zagel, Assistant Attorney General, and Robert A. Novelle, Anthony Montemurro, and Terry Gordon, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE LEIGHTON delivered the opinion of the court:

Defendant, Mohammed Skikada Mostafa and three other men not involved in this appeal, were jointly charged with murder. For reasons which will appear, defendant alone went to trial before a jury and was found guilty. The court sentenced him to serve twenty-five to thirty-five years.

Four points argued by the defendant require consideration. (1) The trial judge committed error when he allowed the jury to hear incompetent testimony; (2) it was an abuse of discretion when, at defendant's request, the trial judge refused to call Aaron Myers as a court witness; (3) the trial judge committed error when he refused to give an instruction which was necessary to inform the jury of the rule it was to apply in judging the testimony of accomplices; and (4) the evidence failed to prove defendant guilty beyond a reasonable doubt.

On Saturday, June 8, 1968, at about 11:00 A.M., a two-door Buick automobile, driven southerly on South Calumet Avenue by a man named Aaron Myers, stopped a few doors south of East 51st Street in Chicago. Michael Walton, a passenger who was next to the driver, and Robert

Walton, who was seated in the back seat with a young woman, Sallie Miller, left the automobile and walked across the street to the Supreme Grocery, on the southeast corner of East 51st Street and South Calumet Avenue. They entered the premises and fatally shot Abder Rayyan, a Jordanian, co-owner of the store. The two killers left the store, ran to the car driven by Myers and drove away. That evening, Myers was arrested. On Monday, June 10, Robert Walton, Michael Walton and Sallie Miller left Chicago and, after intermediate stops, went to Alabama.

A federal warrant charging them with unlawful flight to avoid prosecution for murder was issued. On July 21, 1968, Sallie Miller returned to Chicago. Her mother called agents of the Federal Bureau of Investigation who came to her home and took her into custody. She was questioned and then turned over to state prosecuting authorities. The next day, defendant was arrested. On July 30, 1968, Robert Walton, Michael Walton, Aaron Myers and defendant were indicted for the murder of Abder Rayyan.

The State's theory was that defendant solicited the Waltons to assassinate Abder Rayyan; hence he was accountable for their conduct.[1] Defendant's theory was that the Waltons killed Rayyan in the course of a robbery. In support of this theory, defendant's counsel, prior to trial, interviewed co-defendant Aaron Myers in the presence of his lawyer and an assistant state's attorney. In a transcribed statement, Myers said that on the morning of the killing the Waltons asked him to get them a car for a robbery.

As its last witness in defendant's trial, the prosecution called William J. Martin. At the beginning of his direct examination, defendant objected on the ground that his testimony was not relevant. The objection was overruled. At the end, defendant moved to strike; the motion was denied. Mr. Martin testified that he was then an assistant professor of law at Northwestern University Law School and taught constitutional law at Rosary College. Before his resignation on December 1, 1968, he was the assistant state's attorney "[i]n charge of special prosecutions, the special prosecutions unit in this office." When the case arose, he was assigned to investigate the killing of Abder Rayyan. In doing so, he spoke with Sallie Miller on July 21, 1968 and the same evening in-

---

[1] Ill. Rev. Stat. 1967, ch. 38.
Par. 5—2. *When Accountability Exists*
A person is legally accountable for the conduct of another when:
(a) * * *
(b) * * *
(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, * * * such other person in the planning or commission of the offense.

structed Chicago police officers to withdraw the murder warrant against her. After a conference with the commanding officer of the homicide unit, Chicago Police Department, "[a]rrangements were made to have Miss Miller placed in protective custody."

Under cross-examination, Mr. Martin was asked whether in the course of his investigation he talked with Aaron Myers. He said he had and that a statement was taken from Myers on the day of his arrest. He was asked if Myers' statement mentioned his being hired by the Waltons as the driver of a robbery get-away car. He answered: "My recollection is the word 'robbery' was not used * * *. It was unclear as to his reason for driving the car." In answer to one question, Martin said that the murder "[c]harge against Mr. Myers was *nolle prossed* (*sic*)." He went on to say that an agreement was reached with Myers concerning disposition of the charge against him in return for his testimony because "[w]e believed that his truthful testimony would indicate he did not know that the Walton brothers were entering the store to commit a murder."

On re-direct examination, Mr. Martin was asked, "[d]uring the course of your investigation I believe you stated that there had been no robbery committed over at this store at 51st and Calumet, is that correct?" He answered, "That's correct, * * *." Defendant objected to this answer on the ground that it was a conclusion. A motion was made to strike it. The court ruled, "To the best of his knowledge. It may stand." When questioned further, Martin told the jury that "[t]he murder charge would not be proceeded against Mr. Myers because there was no evidence that he was involved in the murder." Concerning his experience in criminal cases, the former assistant state's attorney said he had investigated or prosecuted "[s]ay hundreds." He went on to say that "[b]ased upon my experience I believed the charges against Aaron Myers should be dismissed because he did not know a crime was being committed * * * therefore we did dismiss the charges." The record before us, however, shows that it was not until June 26, 1969, after defendant was sentenced, that the murder indictment against Myers was dismissed.

This testimony is the subject of the contention that the trial judge committed error in allowing the jury to hear incompetent testimony. It is argued that when Mr. Martin told the jury he placed Sallie Miller "in protective custody," he prejudiced the jury against the defendant. Moreover, it is argued, Martin gave the jury authoritative conclusions concerning a fact which had to be determined before the ultimate issue in the case could be decided: whether the Waltons went to the Supreme Grocery the morning of June 8, 1968, to commit a robbery. Defendant

argues that the testimony, admitted over his objections, first, was prejudicially irrelevant and second, usurped the function of the jury. Further, it put into evidence on a disputed issue the conclusionary opinion of a former assistant state's attorney, a professor of law and a college teacher of constitutional law.

Relevant to the first part of this contention is the testimony of Robert and Michael Walton. Testifying for the State, they told the jury that on two occasions defendant threatened the life of Sallie Miller. Sallie Miller corroborated the Waltons as to one of these occasions. The State's evidence showed the jury that, at the time in question, Sallie Miller was a sixteen year old girl, pregnant eight months with the child of Robert Walton. There was enough to suggest to the jury that prior to trial defendant was at liberty on bail. Thus, implicit in Mr. Martin's testimony that he placed Sallie Miller in protective custody was the prejudicial insinuation that defendant not only would solicit a murder: he would also threaten the life of a pregnant young woman.

■■■ Obviously, the fact that Sallie Miller was placed "in protective custody" did not prove any issue in the case. It was irrelevant. It is the rule that a defendant's guilt must be established by legal and competent proof, uninfluenced by bias or prejudice arising from irrelevant evidence. (*People v. Bernette*, 30 Ill.2d 359, 371, 197 N.E.2d 436; *People v. Battle*, 24 Ill.2d 592, 182 N.E.2d 713, and see *People v. Novak*, 63 Ill.App.2d 433, 211 N.E.2d 554.) Mr. Martin's testimony that he ordered Sallie Miller placed in protective custody prejudiced defendant before the jury. Compare *People v. Glickman*, 27 Ill.App.2d 379, 169 N.E.2d 815.

Relevant to the second part of defendant's contention is his theory that Rayyan was killed in a robbery. Defendant complains that in derogation of his right to have the jury determine the issue, Mr. Martin was allowed to give the jury his conclusion that there was no robbery when Abder Rayyan was killed. The point is made that, over defendant's objections, Martin was allowed to tell the jury that Aaron Myers was not involved in the murder of Abder Rayyan. Defendant argues that Mr. Martin, a lawyer, professor and law teacher, was allowed to put before the jury his conclusions concerning the nature of the events which accompanied Abder Rayyan's killing and the part Myers played in it.

■■ It is an elementary rule of evidence that where a jury can make its own deductions, those deductions should not be made by witnesses who testify before it. In every case, therefore, where a jury has the facts which will enable it to dispense with the opinion or conclusion of witnesses from things they have noticed or described, the opinion or conclusion usually should not be received in evidence. (7 Wigmore on Evidence, par. 1918 (3rd ed. 1940).) In the matter about which com-

plaint is made, Mr. Martin gave the jury his conclusion that on the morning of June 8, 1968, in the Supreme Grocery, there was no robbery. It was error to allow this testimony. (*People v. Rongetti*, 338 Ill. 56, 170 N.E. 14; *People v. Reiter*, 377 Ill. 27, 35 N.E.2d 364 and see *People v. Gleitsmann*, 361 Ill. 165, 197 N.E. 557.) It usurped the province of the jury on a fact question: was there a robbery when Rayyan was killed. See *People v. Schultz*, 260 Ill. 35, 102 N.E. 1045, and *People v. Anderson*, 406 Ill. 585, 94 N.E.2d 429.

The second contention concerns denial of defendant's request that Aaron Myers be called as a court witness. Myers was, in part at least, an eyewitness to the killing of Abder Rayyan, he was a co-defendant, he had given the police a statement, he had been held in the state's attorney's witnesses' quarters and he had given defendant a statement that on June 8, 1968 the Waltons asked him to get them a car for a robbery. After hearing argument on the State's objections, defendant's request that Myers be made a court witness was denied. Thus, defendant was compelled to call Myers as his witness. Defendant contends that denial of his request was an abuse of discretion, and hence, error. He argues that its effect was to deny him the right to examine a witness in a way he needed for his defense. The State challenges this contention with the argument that defendant did not show the trial judge why he could not vouch for Myers' veracity or integrity; and further, defendant did not show how examination of Myers as a court witness would have revealed any testimony directly bearing on the issues of the case.

■■ The principles governing the calling of a court witness are now well established in our criminal law. A witness may be made a court witness, and subjected to cross-examination by either side, where, for sufficient reasons shown, his integrity or veracity is doubtful and neither side desires to vouch for his testimony. (*People v. McKee*, 39 Ill.2d 265, 270, 235 N.E.2d 625.) Calling a person as a court witness rests in the sound discretion of the trial judge. (*People v. Stoudt*, 90 Ill.App.2d 140, 232 N.E.2d 800.) The party requesting that a witness be called by the court must make a showing that manifest injustice would result if the request were refused. *People v. Johnson*, 333 Ill. 469, 165 N.E. 235; *People v. Routt*, 100 Ill.App.2d 388, 241 N.E.2d 206.

■■ The record before us reveals that prior to trial Aaron Myers was listed among those the State could call to testify. He was the only witness to support defendant's theory that Rayyan was killed in a robbery. From colloquy between court and counsel, it appears it was learned that either Myers' lawyer or someone else had intimidated him into retracting the statement he had given defendant. Therefore, defendant's counsel wanted to examine Myers in a way which would allow impeachment,

if necessary. A witness called by the court is neither a prosecution nor a defense witness. Both sides may cross-examine him and they are not prevented from impeaching him. *People v. Robinson*, 14 Ill.2d 325, 153 N.E.2d 65.

■■■ The State argues that in any event defendant was able to impeach Aaron Myers by the questions he was asked. This argument overlooks the difference between the right to impeach an ordinary witness and the right to examine a court witness. Generally, the right to impeach an ordinary witness depends on whose witness he is. It is basic that a party may not impeach his own witness. But the right to examine a court witness includes the right to impeach. In the case at bar, had Myers been called as a court witness, he could have been asked about the statement he gave defendant and if he denied making it, the copy which defendant's counsel had in his possession (insofar as portions of it were inconsistent with the denial) would have been admissible for the purpose of impeachment. (*Rodenkirk v. State Farm Mut. Automobile Ins. Co.*, 325 Ill.App. 421, 60 N.E.2d 269; see *People v. Williams*, 22 Ill.2d 498, 177 N.E.2d 100, and *People v. Jarrett*, 57 Ill.App.2d 169, 206 N.E.2d 835.) If Myers, as a court witness, denied having made the statement, it would have been prejudicial error to refuse admission of those portions inconsistent with his testimony. (*Hapke v. Brandon*, 343 Ill.App. 524, 99 N.E.2d 636; *Dorf v. Egyptian Freightways, Inc.*, 39 Ill.App.2d 2, 188 N.E.2d 103; compare *Esderts v. Chicago, Rock Island and Pacific R. Co.*, 76 Ill.App.2d 210, 222 N.E.2d 117.) As a result of the trial judge's refusal, defendant was deprived of the only witness through whom, in an orderly way, he could have established his defense. Plainly, this was a manifest injustice. The record, and the representations of defendant's counsel, disclosed valid reasons for defendant's unwillingness to vouch for Myers' integrity and veracity. Therefore, it was an abuse of discretion for the trial judge to refuse defendant's request that Aaron Myers be called as a court witness.

The third contention concerns refusal of the trial judge to give defendant's Instruction No. 8, which told the jury that in determing credibility of accomplice witnesses they had "[a] right to take into consideration whether [the accomplice witnesses] have been promised consideration in relation to their punishment for their testimony." The State defends this refusal, arguing that the subject of the tendered instruction was adequately covered in People's Instruction No. 3, which the trial judge modified to include the words "or favorable promises" as a concession to the defendant. Moreover, the State argues, the jury was given People's Instruction No. 13.

"People's Instruction No. 3

You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, or favorable promises, bias or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case.

You should judge the testimony of the defendant in the same manner as you judge the testimony of any other witness.

People's Instruction No. 13

An accomplice witness is one who testifies that he was involved in the commission of a crime with the defendant. The testimony of an accomplice witness is subject to suspicion, and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

■■ In putting defendant's contention into focus, we observe that there were five witnesses who were accomplices in the murder of Abder Rayyan. An accomplice is one who in some way is concerned with the commission of a crime. (*Cross v. The People*, 47 Ill. 152, 158, 95 Am. Dec. 474; *People v. Kelly*, 380 Ill. 589, 44 N.E.2d 563 and see Ill. Rev. Stat. 1967, ch. 38, par. 5—2(c).) As thus defined, one of these was Sallie Miller. A murder warrant against her was released and the charges dismissed. She was housed in motels at public expense and moneys were given her by the state's attorney. Therefore, more than "favorable promises" were made to her. The jury, given the requested instruction, could have found that she was "[p]romised consideration in relation to [her] punishment for [her] testimony." Aaron Myers was held as a witness and later released from custody on his own recognizance. An agreement was made for his testimony. Although when he testified the murder charge against him was pending, the record supports the inference that he knew he was not going to be prosecuted. Thus, as to him, also, it appears there was more than the making of "favorable promises." The jury could have found that he testified as he did because of consideration promised him "[i]n relation to [his] punishment."

■■■ This brings us to a feature of this case. Robert and Michael Walton testified that they pled guilty to the murder of Abder Rayyan and were sentenced to serve 40 to 75 years. They described the negotiation of an agreement that, in return for their testimony against the defendant, the state's attorney was going to recommend their sentences be vacated

and changed to not less than 15 nor more than 30 years.[2] As to the Waltons, then, the State had done more than make favorable promises; it had entered into an agreement in which they had "[b]een promised consideration in relation to their punishment for their testimony." Under these circumstances, defendant was entitled to an instruction that adequately informed the jury of the rule to be used in weighing the testimony of accomplice witnesses. (*People v. Johnson,* 317 Ill. 430, 148 N.E. 255; compare *People v. Kelly,* 73 Ill.App.2d 142, 219 N.E.2d 744.) This, in a general way, was done in People's Instruction 13. However, in a case like the one before us, an instruction must be worded so as to apply the rule to the case on trial. (See *People v. Rosenberg,* 267 Ill. 202, 108 N.E. 54.) This was not done in People's Instruction No. 3. Defendant was entitled to an instruction which told the jury that they should have taken into account the fact, if shown by the evidence, that accomplice witnesses testified for the State under promises of immunity, or that they would be dealt with more leniently if they testified as they did. (*People v. Temple,* 295 Ill. 463, 469, 129 N.E. 85; and see *People v. Rees,* 268 Ill. 585, 593, 109 N.E. 473.) It was error for the trial judge to refuse to give defendant's tendered Instruction No. 8. See *United States v. Reid,* (7th Cir. 1969), 410 F.2d 1223.

■■ We have concluded that in three important respects, error was committed in defendant's trial. Procedural and substantive rights of the accused were adversely affected. Therefore, we must at least reverse the judgment and remand for a new trial. However, defendant contends that the cause must be reversed without remand because the evidence does not prove him guilty beyond a reasonable doubt. *People v. Brown,* 99 Ill.App.2d 281, 241 N.E.2d 653.

■■ The State, on the other hand, argues that the evidence sustains defendant's conviction. Because of defendant's contention and the State's argument, it is our duty to review the record and determine whether there is sufficient credible evidence to support the conviction, or whether the evidence is so improbable, unsatisfactory and insufficient that it leaves a reasonable doubt of defendant's guilt. (*People v. Rossililli,* 24 Ill.2d 341, 345, 181 N.E.2d 114.) We now proceed to discharge this duty.

In doing so, we notice that all the evidence connecting defendant with the murder of Abder Rayyan was furnished by four persons who described themselves as accomplices in the crime. They were Robert

[2] On July 23, 1969, after defendant was sentenced to serve 25 to 35 years, and more than seven months after Robert Walton and Michael Walton had been sentenced to serve 40 to 75 for the murder of Rayyan, the state's attorney made an oral motion to vacate the sentences which had been imposed on the Waltons. The motion was allowed and the two Waltons were each sentenced to serve 15 to 30 years.

Walton, Willie Nelson, Michael Walton and Sallie Miller, who, in the order we have named them, testified for the prosecution. With regard to the actual killing of Abder Rayyan, no other person furnished any evidence which incriminated the defendant. Combining their direct, cross and redirect examination of what they knew, this is what the four told the jury:

*Robert Walton*

"In June 1968 I lived at 4929 South King Drive, Chicago, with Sallie Miller. I knew her. When I ask her to do something she does it. She responds. I knew defendant as 'Big Mike', owner of Mike's Food and Liquor Store, 525 East 43rd Street. Defendant did not know me by the name of Robert Walton, he knew me as 'Yaree'. I patronized him and on occasion we engaged in conversations 'about political issues, the Middle East crisis.' When I was questioned in the County Jail by you [defendant's lawyer], I was asked if I knew the defendant, I said, 'No comment.' Then I said, 'I have never had a conversation with him [the defendant] about anything.'

Defendant read an article I wrote concerning the Middle East conflict. No, defendant does not read very well, his son translated it.

On June 4, 1968, 10:00 or 10:15 A.M., I was in defendant's store and he asked if I had 'any friends who thought like I did and I told him yes.' He told me to bring a couple of friends to his store. That evening, 8:30 or after 9:00 P.M., I brought my brother Michael and Willie Nelson. Defendant asked us to get in his car. As he drove, defendant '[s]aid he was taking us to see a man that a lot of people wanted out of the way.' He drove to East 51st and South Calumet, parked his car on the north side of East 51st Street, pointed to a store on the southeast corner, at a man in a produce coat that was in the window * * * and said, 'That's him in the window.' My brother and I went into the store to get a better look at the man. We returned; defendant drove back toward his store and parked in a vacant lot at East 44th and King Drive. We talked about how much it was worth to kill the man in the grocery store. Michael, using his fingers, indicated that each of us get $5,000. Defendant 'laughed and said for that type of money he would do it himself.' I told defendant $3,000 apiece and my brother said, 'a thousand, no less than a thousand apiece.' Mr. Mostafa 'said he had to see some people and he would let us know.' Defendant let us out of his car and the three of us went to Michael's house.

In a bedroom, door locked, we discussed what had occurred. Nelson said that he didn't trust Mostafa, that we shouldn't go through with this. The next day, the three of us met and Nelson said again he 'didn't

trust Mostafa.' My brother told him '[w]e had to have the money.' My brother and I were not working. Nelson was He withdrew.

That evening my brother and I went to defendant's store. I asked him if the money had been confirmed. Defendant said, 'Not yet, I'll be able to let you know by tomorrow.' My brother and I continued going by [Rayyan's] store and 'checking it out.' The next evening, June 6, I went to defendant's store with my brother. Defendant 'asked me had we hit yet, meaning had we shot Abder Rayyan. I told him no, the price hadn't been agreed upon yet.' I asked him, '[h]ave you had the money confirmed yet?' He said, 'Yes.' I said, $3,000? He said, 'Yes.' He said, '[w]hen are you going to hit?' I told him, '[n]o, we want to check it out * * * maybe tomorrow'. I told him I would stop by his store tomorrow night, at the same time.

On Friday evening, June 7, 1968, my brother, Sallie Miller and I went by Rayyan's store. We went there to 'case the place.' Sallie Miller did not know what we were doing. We returned to Sallie Miller's home. Later Sallie Miller told me that her cousin told her that a man with a funny or foreign accent had called for me. I called defendant's store. Defendant's son told me that defendant wanted to see me that evening. About 9:00 or 9:30 P.M. I went to the store. Defendant '[a]sked me had we hit yet. I told him no. He said why haven't we. I said, 'We still checking it out.' He said, 'you got to hit by twelve o'clock tomorrow or its off.' This was the full extent of that conversation.

On Saturday, June 8, 1968, about 8:00 A.M. my brother Michael, Sallie Miller and I went to Abder Rayyan's store. It was closed. Abder Rayyan was inside. We returned to Sallie Miller's house. We decided to get a car. We went to see Aaron Myers and asked him if he wanted to make $50. I told him that I had to take my wife to the hospital. Aaron Myers got a car. We returned to Sallie Miller's. I told her to get her baby book and appointment card. She did not know why I told her to do this. We went to 51st and Calumet. There we saw a Brink's truck in front of Rayyan's store. I ordered Myers to keep driving, make a turn around the block and come back to the Rayyan store. Myers did that and stopped a few doors south of East 51st Street on Calumet. My brother and I got out, went into Rayyan's store, shot him, backed out and returned to the car. I told Myers to go to 69th and Lowe. There my brother, Sallie and I left the automobile. I telephoned the defendant who came, gave me $10 for cab fare and told me to come to his store that evening for the money. Sallie Miller and I went and defendant gave me $1,000 which I gave to Sallie to count. The next day we learned that Aaron Myers was

arrested. On Monday, June 10, 1968, I called defendant, he came to 64th and Cottage Grove Avenue and gave me an additional $1,000. That evening, my brother, Sallie Miller and I left Chicago. On July 21, 1968, I told Sallie to return to Chicago. We were arrested on August 2, 1968, in Lowndes County, Alabama."

*Willie Nelson*

"I have known Robert and Michael Walton 'maybe 15 years.' On June 4, 1968, I was in the defendant's store in the company of Robert and Michael Walton [i]n the afternoon * * * about 1:00, maybe, in the afternoon, or so.

Defendant took '[u]s to see a man a lot of people wanted out of the way.' He drove to East 51st Street and Calumet, parked on the northwest corner '[a]nd he described the man to us * * *.' We returned and 'parked by a vacant lot.' We talked about the price. Big Mike said he would have to 'talk with some people about it * * * and * * * let us know.' The Waltons and I went to Michael's home. 'We discussed if we were to do it, how we would do it, a knife came up and Bobbie said he had a gun. I said to Bobbie I didn't think it was worth a $1,000 to kill, to kill the man and anyway within the length of time which he had said he wanted it done, within three days, he wanted the man dead in three days. I don't think it was long enough to even, you know, plan any thing like this, you know.' I withdrew."

*Michael Walton*

"On June 4, 1968, around 9:30 P.M., my brother, Robert, took me and Willie Nelson to defendant's store. Defendant drove us and parked at 50th and Calumet. From that point he showed us '[a] man that a lot of people wanted out of the way * * *.' We drove back toward his store and defendant parked his car between King Drive and South Calumet. We had a conversation about killing the man in the store. After some discussion, '[m]y brother said, "Well, three thousand dollars, then."' Defendant said he had to contact some people, 'I'll let you know.' My brother, Nelson and I went to my home and talked about '[h]ow we would do it.' Mr. Nelson decided '[h]e didn't want to * * *.'

The next day my brother and I began 'casing' Abder Rayyan's store. The evening of June 5 my brother came to my home and told me that he saw defendant who told him 'the money hasn't been confirmed.' On June 6, I went to defendant's store with my brother. I saw him have a conversation with the defendant '[b]ut I didn't overhear it too much.' It lasted three or four minutes. My brother asked about the money and defendant said it had been confirmed. '[H]e asked my

brother when we was going to hit.' The next evening, June 7, my brother, Sallie and I went past Abder Rayyan's store 'checking the place out.' Later, my brother told me that defendant 'said it had to be done the next day.'

The next morning we went to Rayyan's store, then we went to Aaron Myers who got a car and drove my brother, Sallie Miller and I to Abder Rayyan's store. We went in and shot him. Myers drove us from there to 69th and Lowe where he left us. My brother made a call and defendant came. I got rid of the guns. That evening my brother told me that he went by defendant's store '[a]nd Mike had gave him $1,000. I did not get any of it '[b]ecause they were all in big bills.' Then we learned Aaron Myers had been arrested. On June 10, 1968 my brother called defendant and he came to 64th and Cottage Grove Avenue. My brother told me that defendant gave him $1,000. I left Chicago with my brother and Sallie Miller on June 10, 1968. After other stops, we went to Lowndes County, Alabama, where we were arrested."

*Sallie Miller*

"I am seventeen years of age, unmarried, the mother of two children. The first week of June 1968 I was pregnant eight months with a child by Robert Walton. I lived with my mother at 4929 South King Drive, Chicago. Robert Walton did not live with me. He stayed in my home and spent '[m]aybe two or three nights a week  *  *  *  [T]he other nights he would tell me [he spent] over at his mother's.' I knew he had guns.

The evening of June 7, 1968, Robert, his brother Michael and I went to East 51st Street and Calumet Avenue past Supreme Grocery. I know what is meant by the expression 'casing the place.' I did not know why the two Waltons took me past Abder Rayyan's store. The night of June 7, 1968 Robert Walton '[s]tayed the night with me. When I woke up, he was there.'

You [defendant's lawyer] ask me whether that Friday night, June 7 Robert slept over at my house. 'I don't know, sir.'

On June 8, 1968 at about 8:00 A.M., Robert Walton, his brother Michael and I walked toward Abder Rayyan's store. I do not know why they took me there. I didn't get to the corner of East 51st because, being pregnant, I became dizzy. Robert and Michael went into the store. Robert bought a bannana and Michael some juice or some salami. They came back to where I was and we went to my home and I went to bed.

About a quarter to eleven Robert Walton came and 'told me to put on my dress  *  *  *  I was attending Michael Reese Clinic, they

gave you a baby book and an appointment card * * *.' Robert told me to take my baby book and appointment card. Did Robert ask me to bring my baby book and appointment card? My answer, 'No, sir.' I did not know why Robert asked me to do this. When I testified before the grand jury I was asked 'Why did he ask you to bring the baby book and appointment card?' I answered, 'He figured that people wouldn't suspect anything of a male and female.' I did not know the Waltons were out to commit a crime the morning of June 8 when they asked me to get into the automobile driven by Aaron Myers. You ask me, didn't Robert tell Michael that night (the night before the killing) that they had to kill somebody before the next day? My answer is I heard him talking to his brother but he was not talking to me. You ask me, 'You heard him say that?' My answer is, 'Yes, sir.'

The automobile driven by Myers left my home on the east side of South King Drive and went north to 49th Street then west Calumet then south to East 51st. When we arrived at that point I heard someone mention a Brink's truck in front of Abder Rayyan's store. Robert Walton told Myers to continue to drive past the store, turn around the block, come back and stop a few doors south of it. I saw Robert and Michael leave the car, go into Abder Rayyan's store, and come back running. I heard some shots. I thought that some friends were shooting at Robert. Then Myers drove to 69th and Lowe. We left the automobile. Robert made a call and the defendant came. He took us in his car some distance away. Then we left him. That evening Robert took me to the defendant's store. Robert gave me money to count, it was $1,000 in ten $100 bills. Some time after the evening of June 8 and before June 10, 1968, I learned that Aaron Myers was arrested. I left Chicago with Robert and Michael Walton. At that time, I wore a 'natural' hairdo. In Detroit, I got a permanent. After we made stops in Detroit, Toledo, Atlanta, we went to Lowndes County, Alabama. On July 21, 1968, Robert sent me back to Chicago. I was taken into custody by FBI agents, questioned and then turned over to Chicago policemen. I told the policemen what Yaree [Robert Walton] told me. I later talked with Mr. Martin the state's attorney's office.[3]"

After the trial judge refused the request that Aaron Myers be made a court witness, defendant called him as an ordinary witness. In addition, defendant and his son testified. Touching only on the area covered by

---

[3] In addition to these four, the State called ten other witnesses. One was a woman employee of the defendant, four were young employees of the deceased who were in the Supreme Grocery the morning Abder Rayyan was killed, three were fellow Jordanians who knew both the deceased and the defendant, one was the FBI agent who took Sallie Miller into custody on July 1, 1968, and the last was William J. Martin, former assistant state's attorney.

the four accomplice witnesses (and combining their direct, cross and redirect examination), this is what they told the jury:

*Aaron Myers*

"I am twenty years old. I know Robert and Michael Walton, Robert maybe five years, Michael one year. On June 8, 1968, at about 9:30 A.M. they came to my home and asked me if I could get a car. First Robert said it was to take his wife to the hospital. Then he changed it and said it was to go to 69th and Normal. They didn't say they wanted the car to go commit a robbery. [Myers was asked whether he gave a statement inconsistent with his testimony. The State's objections were sustained.]

My lawyer asked me if I had made that 'damned statement.' The only thing my lawyer told me was that, you know, I could be 'lexecuted' [phonetic].

On June 8, after I got the car, I drove to 4929 South King Drive, and a woman I had not seen before got into the car. The Waltons told me where to drive and we eventually ended up near 51st and Calumet, a grocery store located there. I saw them go in the store and come out. I did not know what they did.

I was not paid for driving the car. There was no mention of $50. Robert told Clyde [owner of the car] that he would give him $10. After I was arrested, I gave the police a statement. I did not say there was a robbery. I don't recall whether the police asked me if there was any talk about a robbery."

*Mohammed Mostafa*

"I am fifty-two years of age, born in Palestine. I am an Arabian with a third-grade education in Jordan. I am married, have four children and ten grandchildren. I came to this country in 1956, and was employed in New York then in Chicago, doing marble work. In 1962, I went into the food and liquor business for myself at 525 East 43rd. My son Musarab worked in the store.

I know Robert and Michael Walton. I've seen them in my store. I do not know them by name. I have never known Robert Walton by the name of Yaree. I know Willie Nelson. I do not know his name nor nickname.

I have never discussed the Middle East crisis with either Walton. I have no back room in my store. Everyone can see from front to the back. I have never asked either of the Waltons whether they knew people who thought as they did. I never asked them to bring anyone to my store. Neither the Waltons nor Willie Nelson came to my store on June 4, 1968. I do not know the slang used by the Waltons. I did not go with the Waltons and Nelson to the vicinity of 51st Street and

Calumet on June 4, 1968. I never said to either of the Waltons nor to Nelson that I would show them a man a lot of people wanted to get rid of. I never discussed with the Waltons nor Nelson anything about killing a man for money. I never pointed out to the Waltons nor to Nelson anyone in a grocery store. I knew Abder Rayyan. We were friends. I helped him when he came to this country. I have never seen Sallie Miller in my store. I never took any of the Waltons in my store and gave them $1,000 at a time. I never went to 69th and Lowe and met the two Waltons and Sallie Miller. I never went to the vicinity of 64th and Cottage Grove, nor anywhere else and met the Waltons and gave Robert Walton money."

*Musarab Mostafa*

"I am the son of the defendant. I work with my father in his store. I work from 1:00 P.M. to 12:00. My father works from 7:00 in the morning until 1:00 in the afternoon then from 6:00 P.M. or 7:00 until closing time. Then the two of us go home together. I knew the Waltons, not by name. I did not know a telephone number where they could be reached. I never called Robert Walton and left word that my father wanted to see him. On the day my father was arrested I received a telephone call from a woman who identified herself as Sallie Miller. I told her I never heard her name before. She said she was going to turn herself in, I said 'Go anywhere you want. I don't know you and I don't know nothing about you.' " [4]

■■■ This review discloses that defendant's conviction was procured on the uncorroborated testimony of accomplice witnesses. Testimony of accomplice witnesses is competent, and if, considering all the facts and circumstances in evidence, the testimony proves guilt beyond a reasonable doubt, it will authorize a verdict of guilty, whether corroborated or not. (*People v. Nastasio*, 30 Ill.2d 51, 195 N.E.2d 144; *People v. Kendall*, 357 Ill. 448, 453—54, 192 N.E. 378; *People v. Dell*, 77 Ill.App.2d 318, 222 N.E.2d 357.) This rule has the corollary that a conviction resting solely on testimony of accomplices will not be disturbed on appeal where the facts and circumstances testified to by accomplices, scrutinized by rules governing appraisal of testimonal evidence, are sufficient to prove guilt beyond a reasonable doubt. *People v. Karatz*, 365 Ill. 255, 5 N.E.2d 842.

■■■ However, the utmost caution is required of a court or jury when reliance is on accomplice testimony alone, most particularly where the witnesses are self-confessed and discredited criminals and the proof

---

[4] In addition, defendant called three character witnesses, two court reporters, an investigator, and the director of the behavior clinic of the criminal court who had examined Robert Walton.

shows that the accused is a respectable and law abiding citizen. (*People v. Hansen*, 28 Ill.2d 322, 332, 192 N.E.2d 359; *People v. Freidman*, 383 Ill. 193, 48 N.E.2d 950; compare *People v. Wollenberg*, 37 Ill.2d 480, 229 N.E.2d 490.) This caution is usually accompanied by the admonition that when accomplice witnesses have hopes of reward from the prosecution, their testimony should not be accepted unless it carries with it absolute conviction of its truth. *People v. Hermens*, 5 Ill.2d 277, 285—86, 125 N.E.2d 500; *People v. Zaeske*, 67 Ill.App.2d 115, 213 N.E.2d 577; and see *Bland v. State*, Del., 1970, 263 A.2d 286, 289.

In this case Robert Walton and Michael Walton were admitted murderers. Without compunction, they told the jury how they planned the murder of Abder Rayyan and carried it out. They were convicted felons. Robert, at the time of his testimony, was awaiting trial for the murder of a 14-year old boy. Michael was a dope peddler. Both Waltons admitted that while awaiting trial, they embarked on a scheme to have Robert Walton declared incompetent to stand trial. Their criminal minds conceived the bizarre idea that if one could be found incompetent, both would escape punishment. Accordingly, Robert, with Michael holding him during appearances in court, pretended he was catatonic. This plan brought about a psychiatric examination of Robert by the director of the court's behavior clinic. The pretensions of the Waltons were so successful that the experienced psychiatrist found Robert Walton incompetent to stand trial. A jury however, impanelled to determine Robert Walton's competency, decided otherwise.

When asked about this fraud, both Waltons admitted they had lied to the court in their representations; they readily admitted having lied before. In addition, both Waltons testified that when, on November 18, 1968, they pled guilty to Rayyan's murder, they did so without any agreement that they would appear as witnesses for the State. This testimony was later the predicate for argument that the Waltons were believable because they were repentent criminals who had manifested the first step toward rehabilitation by pleading guilty to murder without any agreement for their testimony.

The record before us, however, reveals that on the day the Waltons pled guilty, the State filed with the clerk and served on counsel for the defendant a supplemental list of witnesses signed by assistant state's attorney James B. Zagel and William J. Martin. Robert Walton and Michael Walton were named as witnesses for the State. Our knowledge of criminal law and the nuances of its practice rebels against the suggestion that prosecuting attorneys will list two capital-case defendants as witnesses for the State without their agreement in advance. We construe the supplemental list of witnessees as a silent impeachment of the

Waltons which brands as untrue what they told the jury in this regard. Additionally, there is the agreement that in return for their testimony, their sentences of 40 to 75 years were to be reduced to 15 to 30. Therefore, their character, their propensity for fraudulent conduct, their demonstrated untruthfulness and their interest warn of the possibility that they were no more truthful to the jury that determined defendant's case than they were to the jury that determined Robert Walton's competency. Thus warned, we turn to a scrutiny of their testimony and that of those over whom they had influence.

Of the four accomplice witnesses, Robert Walton was the most important. He told the jury that prior to June 4, 1968, he had many conversations with defendant. Yet, when questioned by defendant's counsel before trial, he said, "I never had any conversation with him about anything." He told the jury that in June 1968 he lived with Sallie Miller. Sallie Miller denied this. He explained defendant's confidence in him as acquired through an article he wrote concerning the Middle East conflict. When reminded that defendant could not read English, he then claimed that defendant's son, Musarab, translated the article.

He told the jury that on June 4, 1968, at about 9:00 at night, he took his brother and Willie Nelson to the defendant's store. Willie Nelson testified that he was in defendant's store in the afternoon, about 1:00 P.M. With regard to the alleged drive on which defendant took the Waltons and Nelson to 51st and Calumet, Robert Walton said defendant parked the car on the north side of 51st Street. His brother Michael said that the car was parked at 50th and Calumet. Willie Nelson said that the car was parked on the northwest corner of 51st and Calumet.

Robert Walton told the jury that after the defendant talked about killing Abder Rayyan, he, his brother and Nelson went to a locked room where they discussed the project. Nelson, according to Robert, doubted the wisdom of the project because "[h]e didn't trust Mostafa." Willie Nelson, however, described himself as a man of scruple. He withdrew from the murder project, not because he mistrusted defendant, but because he thought the money was not enough. Moreover, Nelson said, defendant wanted it done in three days. We observe that neither Robert nor Michael Walton claimed that in the conversation during the evening of June 4, 1968, anything was said about a time limit for the assassination of Abder Rayyan.

Concerning the morning of June 8, 1968, Robert Walton said that he and his brother went to Aaron Myers and asked if he wanted to earn $50 getting a car for them. He wanted his "wife" taken to a hospital. Myers said that this did not happen; there was nothing said about $50. Robert Walton first spoke about going to a hospital, then changed it and said he

wanted to be taken to 67th and Lowe. With regard to defendant's solicitation of Rayyan's murder, Robert Walton told the jury that he and his brother Michael, were to receive an equal sum of money. In fact, he said, the evening after the killing, defendant paid him the first sum of $1,000 "in ten $100 bills." But Michael testified he never received any of this money because "it was in big bills." One need not be an arithmetician to see the ease with which ten $100 bills can be divided between two persons.

Sallie Miller, concerning whom Robert Walton said, "[w]hen I ask her to do something she does it," testified that she did not know why the Waltons took her by Abder Rayyan's store, even though she knew what was meant by "casing the place." She stated that when Robert Walton told her to take her baby book and appointment card, she did not know why he made the request. However, before the grand jury, she believed Robert Walton "[f]igured that people wouldn't suspect anything of a male and female." During cross-examination she admitted that the night before Rayyan's murder she heard a conversation between the Waltons about killing a man the next day. Then, in a moment of immodesty, she told the jury that on the day she and the Waltons fled Chicago, she wore a "natural" hairdo. At their first stop, Detroit, Michigan, she changed her hair style to a "permanent." This is not conduct that reflects a mind free of guilt. Nonetheless, Sallie Miller insisted that when she accompanied them on the morning of June 8, 1968, she did not know the Waltons were embarked on a murder.

We have studied the testimony of the four witnesses who furnished all the evidence against the defendant. We observe that Willie Nelson told the jury the alleged meeting between the Waltons and the defendant took place about 1:00 in the afternoon of June 4, 1968. Both Waltons said the meeting occurred sometime between 8:30 and 9:30 P.M. Nelson gave a description of the occurrence that materially differed from that given by the Waltons. Therefore, Nelson's testimony was a material and direct contradiction of Robert and Michael Walton. Moreover, when scrutinized carefully, the testimony of the two Waltons impeached each other, and they were materially and directly contradicted by other facts in the record.

■■ As to Sallie Miller, we are convinced that she first persuaded the assistant state's attorneys she was not involved in the murder of Abder Rayyan; then aided by this fact, she appeared before the jury as a believable witness who had the support of the prosecution. When all of her testimony is examined, it reveals a cunning untruthful witness who was materially and directly contradicted by the Waltons and by other

evidence in the record. Material corroboration or directed contradiction of accomplice testimony is entitled to great weight. *People v. Mentola*, 47 Ill.2d 579, 268 N.E.2d 8; *People v. Durham*, (Ill.App.2d), 269 N.E.2d 348.

■■ When the impeachment of their testimony is considered, and the extent to which they were contradicted is taken into account, we are compelled to conclude that the evidence furnished by Willie Nelson, Robert Walton, Michael Walton, and Sallie Miller is not credible, nor is it of that satisfactory kind on which the guilt of a defendant can rest. The fact that the jury has returned a verdict of guilty is not conclusive of the sufficiency of the evidence to sustain the conviction. *People v. Kessler*, 333 Ill. 451, 164 N.E. 840.

■■ In the case before us, questions concerning the sufficiency of the State's evidence assume importance when defendant's testimony is examined. Categorically and in detail, he denied the testimony of Willie Nelson, the Waltons and that of Sallie Miller. Vigorous cross-examination did not shake his denials. In important respects he was corroborated by his son Musarab. In addition, three character witnesses (a bank vice-president, an insurance agent, and a neighbor) attested to defendant's reputation as a peaceful, respectable, and law abiding citizen. It is true that evidence of good character proves neither guilt nor innocence. (*People v. Bridgewater*, 369 Ill. 633, 17 N.E.2d 556.) However, in a particular case, it cannot be disregarded and it may be sufficient to raise a reasonable doubt of the defendant's guilt. *People v. Eatman*, 405 Ill. 491, 91 N.E.2d 387.

■■ In a case like this one, it is our duty to review the evidence, and if we find that credible evidence is lacking, or that the evidence is improbable, unsatisfactory, or insufficient to remove all reasonable doubt of defendant's guilt and create an abiding conviction that he is guilty, we will reverse the conviction. (*People v. Sheppard*, 402 Ill. 347, 83 N.E.2d 587.) Although we are committed to the doctrine that jurors are the judges of the weight of the evidence, we will not hesitate to reverse a judgment of conviction when we find the evidence raises little more than a suspicion against the accused and leaves a grave and serious doubt of his guilt. *People v. Dougard*, 16 Ill.2d 603, 607, 158 N.E.2d 596; see *People v. Weitzman*, 362 Ill. 11, 198 N.E. 711.

■■ It is our judgment that the evidence in this case, consisting of impeached, contradicted and uncorroborated testimony of accomplice witnesses, does not support the verdict of the jury. Therefore, defendant's conviction cannot stand. (*People v. Hudson*, 341 Ill. 187, 173 N.E. 278.) The judgment is reversed without remand of the cause for another trial.

180

*People v. Rendas,* 366 Ill. 385, 9 N.E.2d 237; *People v. Bradley,* 375 Ill. 182, 30 N.E.2d 636, and see *People v. Cohen,* 376 Ill. 382, 33 N.E.2d 593.

Judgment reversed.

SCHWARTZ and GOLDBERG, JJ., concur.