(No. 42385.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* CHARLES DENNIS, Appellant.

*Opinion filed Oct. 7, 1970.—Rehearing denied Dec. 3, 1970.*

WARD, J., took no part.

GERALD W. GETTY, Public Defender, of Chicago, (STUART B. SCUDDER and JAMES J. DOHERTY, Assistant Public Defenders, of counsel,) for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, EDWARD V. HANRAHAN, State's Attorney, of Chicago, and (JAMES B. ZAGEL, and ROBERT A. NOVELLE, and DONALD N. NOVELLE, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE CULBERTSON delivered the opinion of the court:

This is an appeal from the circuit court of Cook County which, after a jury trial, adjudged defendant Charles Dennis guilty of the offense of armed robbery and sentenced him to imprisonment in the penitentiary for a period of not less than 40 nor more than 80 years. Constitutional questions being presented, the appeal reaches us directly from the circuit court. See our Rule 603. 43 Ill.2d R. 603.

The evidence elicited on behalf of the State during defendant's trial consisted of the testimony of two witnesses. The complaining witness, Robert Brown, testified as follows: In the early morning hours of August 4, 1966, specifically around 1:30 to 1:45 A.M., Brown was operating a taxicab in a southerly direction on Cottage Grove Avenue near Drexel Square in Chicago, when he was hailed over to the curb by three persons. Brown pulled his cab over to the curb and to a point about 20 feet from a brightly lit street light in order to pick up the passengers. The first person to enter the cab was a dark-complected Negro male of about 150 lbs. in weight and standing about 5'7" or 5'8" tall. This passenger, after getting into the cab, took the left back seat directly behind Brown. The next person to enter was a Negro woman weighing about 105 lbs. and of an estimated height of 4'11" to 5'1". The woman took the middle back seat. The third person to enter the cab was another Negro male about 5'11" to 6'0" in height wearing a light, long, trench coat. This person, identified in court by Brown as the defendant, took the right back seat in the taxi. After the three were settled, the man directly behind Brown told him to go to 7725 South Dobson, which he did. During the trip, which lasted about 15 minutes, Brown had occasion to intermittently glance to his right rear in the process of changing lanes of travel, during which times he had opportunities to observe the face of the passenger in the right rear seat. Upon reaching the South Dobson address, Brown stopped his cab. At that location it was quite dark, but immediately after stopping the cab, Brown turned on the courtesy lights, one of which was located over the windshield inside the cab and the other of which, also inside the cab, was mounted just above the back window. According to Brown, the courtesy lights were bright enough to allow a person to read a newspaper.

After the courtesy lights were lit, Brown turned to his right to collect his fare, looking directly into the face of

the person in the right rear seat. Thereupon Brown heard a "click", after which he observed, in the hands of the person directly behind him, a sawed-off shotgun. The barrel of the gun was directed toward Brown's head. Brown was told to turn off the courtesy lights, to shut off the motor, and to leave the keys in the ignition, all of which he accomplished. The man directly behind Brown then said to him "Let's have it," and when Brown failed to do anything, the man in the right rear seat brought his face within twelve inches of Brown's and admonished Brown not to "play crazy." Brown thereupon handed the latter approximately $25 in currency.

Brown subsequently, at the direction of his assailants, got out of his cab and ran away from the scene into a park, where he remained for about ten minutes. He then walked to the corner of 77th and Dobson, where he had been told by the robbers he would find his keys, located the keys, and started walking. Shortly thereafter, Brown hailed a passing taxi and caused the calling of the police. When an officer arrived, Brown had a conversation with him.

On August 6, 1966, Brown had a conversation with Detective Stuart Bradshaw of the Chicago Police Department at the police station located at 92nd and Cottage Grove, during which conversation Brown viewed some 50 to 60 photographs, none of which he could identify as photos of any of the robbers. Defendant's photograph was not among those Brown observed. After Brown gave Detective Bradshaw a description of the individuals who robbed him, he left the police station. Subsequently, on August 23, 1966, Brown again had occasion to visit a police station, this time at 1121 South State Street. After a conversation with Detective Bradshaw, Brown was directed to view a lineup. He observed four male Negroes in the lineup and immediately identified the defendant as one of the robbers in question, specifically as the man who occupied the right rear seat of his cab on the morning of the robbery. Prior to this identi-

fication, nothing had been said to Brown about any of the individuals in the lineup.

On cross-examination, Brown stated that when he was initially interviewed by a police officer after the incident, he gave a description of the robbers. Brown then testified that he didn't remember whether such police officer was writing the description down or not. However, Brown further saw the officer writing during the conversation and specifically while Brown was talking. Just what the officer wrote, Brown did not know. It was further brought out that Brown subsequently gave another description of the offenders to Detective Bradshaw. It does not appear, however, that this description was reduced to writing. Brown denied giving a description of the offenders to the first officer with whom he talked after the occurrence which differed from the one he gave Detective Bradshaw. With regard to the lineup, Brown stated on cross-examination that he had talked with Detective Bradshaw prior thereto. Bradshaw at that time told Brown that the latter had been asked to come to the station to view a lineup. Of the men in the lineup, Brown recognized only the defendant.

The State next called Detective Stuart Bradshaw, who testified that, in connection with his duties, he was assigned to the case in question, that he first had a conversation with Brown on the telephone when the latter was asked to come to the police station for the viewing of photographs. Brown was unable to identify any of the photographs, but did give an oral description of the offenders to Bradshaw. Brown thereupon re-enacted the crime for Bradshaw, after which he left the station. Bradshaw continued his investigation, leading to defendant's arrest on August 22, 1966. Brown was again contacted and the lineup ensued. Prior to the viewing of the suspects, Bradshaw told Brown that there would be four Negro males in the lineup, and that Brown was not to say anything until the lineup was over. The defendant was not mentioned nor were any of the other men

in the lineup. Brown, upon viewing the suspects, immediately identified the defendant.

Prior to defense cross-examination of Bradshaw, the State delivered all reports which had been made out by him to defense counsel. The assistant State's Attorney then represented that the reports thus delivered "* * * constitute every single report that every investigating officer made and filed with the Chicago Police Department except for the one report made by a beat officer on August the 4th, 1966 * * *."

On cross-examination Bradshaw testified that although Brown indeed had given him a description of the offenders during their August 6, 1966, interview, such description was not transcribed. After having obtained such description of the offenders, Bradshaw phoned in a wanted message to the police communications center, which message described the offenders in the words of Robert Brown. There is no showing that the contents of this particular communication were ever transcribed, although Bradshaw had on other occasions and in connection with other matters seen wanted messages which had been reduced to writing.

For the defense, the defendant testified in his own behalf that the first time he had ever seen Brown was at the trial when the latter took the witness stand, and that he had not robbed Brown at any time. On cross-examination defendant stated that on the evening before the morning of the robbery he believed that he and his girl friend had attended a movie, although, he stated, his memory was hazy. He believed that he had left the theater about 11:00 P.M., and from there he went directly to his apartment. He did not thereafter leave the apartment, and by midnight on August 4, 1966, he had been asleep. Defendant stated that he was acquainted with one Vernon Smith, but couldn't recall whether he had seen him on the night in question. Defendant stated that Smith was a close personal friend, and although they had not seen each other at any time since

126

August 4, 1966, defendant had written to Smith. Defendant might have on occasion been in a restaurant with Smith, but he had never eaten a meal with him.

In rebuttal, the State introduced a record of defendant's January 30, 1958, conviction of the offense of armed robbery as tending to impeach his veracity. The jury was of course subsequently instructed that the record of the prior conviction was to be used only for the purpose of affecting the witness's credibility.

The State then asked the court to call Vernon Smith as a court's witness, which request was honored, Smith testifying as follows: On August 3, 1966, he was a bartender at the Vogue Lounge, working from 7:00 P.M. until 4:00 A.M. the next morning; that defendant had been in the Vogue Lounge on August 3, 1966, from 9:00 P.M. or 10:00 P.M. until 11:00 P.M., when he left for awhile. He returned shortly and stayed at the lounge until 4:00 A.M. the next morning. Smith and defendant had eaten together in restaurants on several occasions.

On cross-examination by the defense, Smith at least implicitly reaffirmed that he had been with the defendant on August 3 and 4, 1966, as stated during the State's examination.

Prior to the commencement of defendant's trial, the defense filed a written motion to suppress all identification testimony. The motion asserts in relevant part as follows: (1) the identifications were induced by the manner which the police acted, directly causing the identification witness to point out the defendant in violation of his constitutional rights under the fifth and fourteenth amendments of the United States constitution; and (2) the defendant was not advised of his right to have counsel present at the time of the confrontation in violation of his constitutional rights under the sixth amendment to the constitution of the United States.

The State's response to the motion to suppress was an

oral motion to strike, contending that the Code of Criminal Procedure of 1963 does not provide for such a pretrial motion, and that in any event the motion was not sufficiently specific so as to advise the State exactly what conduct of the police was claimed to have deprived defendant of his constitutional rights in connection with his identification. After entering into a stipulation that defendant's lineup had occurred on August 23, 1966, defense counsel made the following offer of proof: "Well, if allowed to proceed on this motion, I expect to be able to show that by calling the complaining witnesses, that the police talked to them prior to the lineup. They indicated they had a man in custody for several armed robberies. They placed him in a three-man lineup. They showed the complainant pictures of the man, of Dennis, beforehand. And their actions, in other ways, indicated to the complaining witness that Dennis was the suspect the police believed to have been involved in armed robberies. And after that occurred, that the complaining witness picked out Dennis * * *."

Thereupon, after some further colloquy, the trial court allowed the State's motion to strike item (2) of defendant's motion and summarily denied item (1) thereof. No evidentiary hearing was held.

Defendant contends that the trial court erred in summarily denying paragraph 1 of his pretrial motion to suppress and asserts that he should have been allowed an evidentiary hearing on the question as to whether defendant had been denied due process of law under the teachings of *Stovall* v. *Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 Sup. Ct. 1967, in connection with his identification by the complaining witness at the lineup.

While the Code of Criminal Procedure does not specifically provide for a pretrial hearing on the issue of the admissibility of identification testimony, we agree with defendant's claim that such a proceeding should be held in an appropriate case where a timely request is made. We also

agree that a pretrial hearing should have been conducted here. However, since this identification occurred before the decisions of the Supreme Court in *United States* v. *Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert* v. *California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, the identification testimony is constitutionally impermissible only if the procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification that defendant was denied due process of law. (*Stovall* v. *Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) In *Stovall* no pretrial hearing had been held in the trial court, and the Supreme Court affirmed the denial of *habeas corpus* relief without requiring such a hearing. In the present case there is abundant evidence to show that the victim had adequate opportunity to observe the defendant under well-lighted conditions. It is clear from this record that the witness had an independent source of identification, apart from the line-up and even if defendant had been able to establish that improper procedures were employed at the line-up, it could not be said that any such procedures were so conducive to irreparable mistaken identification as to deprive defendant of due process of law. The denial of defendant's request for a pretrial hearing was, at the most, harmless error. *People* v. *Moore,* 43 Ill.2d 102; *People* v. *Gershbacher,* 44 Ill.2d 321, 324.

Defendant next argues that the trial court erred in refusing his repeated requests for an order requiring the production of the report made out by the police officer who initially interviewed the complaining witness shortly after the crime. In this connection, it became apparent during the cross-examination of the complaining witness that in this initial interview the latter gave an oral description of the offenders to the police officer. Thus the complaining witness testified that he had a conversation with a police officer, that he gave a description of the offenders, and that while he was talking the officer was writing. The complain-

ing witness did not, however, see what the officer had written, as he testified that he could not tell what the officer had written down during the interview. The assistant State's Attorney, while admitting the existence of the report, advised the court that it did not contain statements of the complaining witness. The officer who made the report was not called to the witness stand by either the defense or the prosecution, and under these circumstances we believe the trial court acted properly in refusing to order the production of the report. As we observed in *People* v. *Durso,* 40 Ill.2d 242, 250, "[t]he law is well settled that a defendant is entitled to a previous statement of a witness to be used for impeachment purposes, but the requirement applies only to specific statements which have been established to exist and which are in the witness's own words or substantially verbatim. (*People* v. *Neiman,* 30 Ill.2d 393; *People* v. *Wolff,* 19 Ill.2d 318)." It is thus incumbent upon the defense to establish as a prerequisite to production of a possibly impeaching statement that it not only exists but is rendered in "the witness's own words or substantially verbatim." Defendant here established only the first requirement, and made no effort whatsoever to refute the assistant State's Attorney's in-court assertion that the report did not contain a statement of the complaining witness. In this regard, the defense could have requested the court to conduct a hearing outside the presence of the jury for the purpose of securing the testimony of the officer who made the report. Having failed to establish that the report contained a statement of the complaining witness in his own words or substantially verbatim, defendant was not entitled to its production. *Durso; People* v. *Golson,* 37 Ill.2d 419.

Defendant further asserts that the trial court erred in quashing a *subpoena duces tecum* issued to the Chicago Police Department prior to trial, at the behest of defense counsel, calling for the production at the trial of "All Police Records, Including All Statements of Witnesses, Including

Complaining Witness' (Robert Brown * * *) Statements, Interdepartmental Records, Arrest Slips, Station Complaint Book and Field Report." Defendant maintains that the trial court should have, instead of quashing the subpoena on motion of the State, as was done, allowed the delivery of the documents to it for an *in camera* inspection in order to ascertain whether there were documents in the police department file which might ultimately be employed by the defense for impeachment purposes. Defendant, in support of this proposition, relies principally upon our decision in *People* v. *Wright,* 30 Ill.2d 519, where we remanded a cause for the purpose of having the trial court conduct an examination of police department files in order to resolve the question of whether they contained a statement signed by a prosecution witness, which statement, according to that witness, did exist at one time. The defendant, in conjunction with the remand, was to receive a new trial only if the witness's statement was found in the police department files and was otherwise qualified for impeachment purposes. Here, however, unlike the situation in *Wright,* there has been no adequate showing that any possibly impeaching material was ever in existence. The admittedly existing police report of the initial interview with the complaining witness was, as earlier indicated, not shown to have contained a statement properly attributable to such witness, and the oral description of the offenders given by the complaining witness to Detective Bradshaw as a basis for his telephonic transmission of a "wanted message" to the police communications center was not established as ever having been transcribed. The assistant State's Attorney declared unequivocally to the court and defense counsel that no statements attributable to the complaining witness were possessed by the prosecution and further tendered all other police reports in his possession to the defense. There is nothing in this record which indicates that defense counsel was prevented from attempting to lay a foundation for

the production of statements attributable to the complaining witness. He merely failed to do so. We accordingly find no error in the trial court's order quashing the subpoena in question. See *People* v. *Durso; People* v. *Golson.*

It is next contended by defendant that the trial court committed reversible error in allowing the State's request that Vernon Smith be called to the stand as a court's witness, and further, in admitting testimony of Smith which impeached that given by defendant on collateral matters. As we have seen, Smith testified that defendant had been in the Vogue Lounge, where Smith was a bartender, for largely the entire evening of August 3, 1966, and had remained there until 4:00 A.M. the next morning. This testimony, although affording defendant an alibi, was wholly inconsistent with defendant's testimony that he had been at the theater with his girl friend during the evening of August 3, 1966, and had been in bed asleep by 12:00 midnight.

Prior to Smith's being called as a court's witness, the State had elicited during its cross-examination of defendant that he and Smith were close personal friends, but that if Smith would say that defendant had been in the Vogue Lounge during the evening of August 3, 1966, after 9:00 P.M., Smith was mistaken. The State had further advised the court that Smith was listed as an alibi witness by defendant pursuant to the State's request for a list thereof. (See Ill. Rev. Stat. 1967, ch. 38, par. 114—14.) In this regard, the State asserted that Smith had been listed as an alibi witness in connection with the instant offense, while defense counsel maintained that Smith was an alibi witness only on another offense with which defendant was also then charged. While the record properly before us does not resolve the question as to which charge Smith had been listed as an alibi witness, we believe it of no moment in any event. The State sufficiently established why it could not vouch for Smith's veracity (*i.e.,* his close personal friendship with

defendant and his being an alibi witness for defendant on a pending charge) and the testimony elicited from defendant·by the State during cross-examination clearly intimated what Smith would say if called to the witness stand (*i.e.*, that defendant had been in the Vogue Lounge on August 3, 1966, after 9:00 P.M.). Moreover, after Smith had been called but before much testimony had been elicited from him, the prosecution, at the request of the court, stated exactly what it hoped to show through the use of Smith, *i.e.*, that Smith would give an alibi for defendant which differed from that theretofore interposed by the latter during his testimony. Smith's prospective testimony thus clearly related to a direct issue—the whereabouts of defendant at the time of the offense. As observed by us in *People* v. *Moriarity*, 33 Ill.2d 606, 615, the requisite foundation which must be laid for the calling of a witness as a court's witness consists of the giving of reasons as to why the party desiring the witness so called cannot vouch for his veracity, and a showing that the testimony of the witness will relate to direct issues and is necessary to prevent a miscarriage of justice. We believe those requirements were satisfied here.

As for defendant's argument that the prosecution was allowed to impeach defendant's testimony on collateral matters, we think it clear that defendant himself put in issue his whereabouts on the night in question when he stated that he had been to the theater with his girl friend and in bed asleep at his apartment by midnight. While defendant maintains in his brief that he made no direct statement as to his whereabouts during the night of the robbery, and that he stated that his memory was hazy on the question, a careful reading of the record clearly establishes that defendant repeatedly maintained that he had been at the theater and at home in bed by midnight. Only after the jury heard the testimony of Smith did defendant, on rebuttal, state unequivocally that he didn't recall where he had been on the evening of August 3, 1966. The bulk of Smith's

testimony was concerned with defendant's alleged presence at the Vogue Lounge at the same time, thereby directly contradicting the testimony of defendant on this crucial point. This testimony of Smith thus clearly did not relate to a collateral issue but indeed went to the heart of the credibility of defendant's theretofore asserted alibi. The prosecution was further allowed, however, to elicit testimony from Smith that he had eaten meals in restaurants with the defendant on several occasions, thus contradicting defendant's earlier assertion that he had never eaten a meal with Smith in a restaurant. In our judgment this testimony amounted to impeachment of defendant's testimony on a purely collateral matter, and the trial court erred in admitting it. Nonetheless, however, we do not believe the introduction of this testimony could possibly have been sufficiently prejudicial to defendant to warrant a reversal of this conviction; and what we observed in *People* v. *Crump*, 5 Ill.2d 251, 255, is particularly appropriate here: "The record before us is voluminous, the defendant was aggressively represented, and the trial was a bitter one. No trial judge can be expected to sit as an arbiter in such a contest without the intervention of error. Too many rulings must be promptly made in the hurried process of trial for there to be a perfect record." We accordingly hold that the trial court's admission of the impeaching testimony given by Smith that he had eaten in restaurants with defendant was harmless error and of no prejudicial consequence.

Interwoven with defendant's argument that the court should not have called Vernon Smith as its witness is his suggestion that he was unable to adequately cross-examine Smith as to the actual date of defendant's presence in the Vogue Lounge without bringing before the jury defendant's pending charge for another offense, which apparently occurred on August 8, 1966. We gather from defense counsel's assertions in the record in connection with his objections to the court's calling of this witnesss that Smith was

to be an alibi witness for defendant concerning the August 8, 1966, offense, and that Smith in fact knew nothing about defendant's whereabouts on August 3rd. However, Smith stated on the witness stand that he was absolutely sure that defendant had been in the Vogue Lounge on the latter date, and maintained his position even when defense counsel sought to correct him. Any dilemma caused defendant in this regard is of course not chargeable to the State, and, as we have held Smith was properly called as a court's witness, is of absolutely no moment here.

It is next maintained that defendant was denied an adequate hearing in aggravation and mitigation by virtue of the trial court's refusal of defense counsel's request for a presentence investigation. We do not agree. The record establishes that a hearing in aggravation and mitigation was held, at which time defendant was afforded every opportunity to present matters in mitigation of the offense. He nonetheless presented to the court only matters concerning the circumstances of the instant offense. It was clearly incumbent upon defendant to present any further mitigating circumstances (*People* v. *Nelson*, 41 Ill.2d 364), and defense counsel's bare assertion that he knew nothing of defendant's background shows only his failure to comply with that burden.

Defendant's final contention of error involves the alleged refusal of the trial court to allow the defense to inspect the defendant's "rap sheet" (*i.e.*, the police record of *inter alia* his prior convictions) during the hearing in aggravation and mitigation. As we read the record, defendant made no specific request to inspect the document, defense counsel merely relating to the court that he had not seen a copy thereof prior to the hearing in aggravation and mitigation. We thus do not believe the court in fact refused defendant's request to inspect the document, and clearly committed no error. It has been held by the appellate court that information relating to prior convictions contained in such

a "rap sheet". even though hearsay, may nonetheless be considered during the hearing in aggravation and mitigation, where strict evidentiary rules are not applicable. (*People* v. *Forman,* 108 Ill. App. 2d 482.) We concur with that view. And although we agree with defendant that he should be allowed to inspect the document during the hearing in aggravation and mitigation, his failure to avail himself of that right was of no apparent consequence here. We say this because defendant made no claim whatever that the matters read into the record by the assistant State's Attorney were in any manner incorrect or erroneous.

For the reasons herein specified, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.