THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES WATSON, Defendant-Appellant.

First District (5th Division)    No. 63154

Opinion filed March 31, 1977.

James J. Doherty, Public Defender, of Chicago (William F. Krahl, Jr., and Gail Moreland, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Joan S. Cherry, and Loretta Hall Hardiman, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Defendant, James Watson, was charged by indictment with the offense of murder. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1.) After a jury trial defendant was found guilty of voluntary manslaughter. (Ill. Rev. Stat. 1973, ch. 38, par. 9—2.) Judgment was entered on the verdict and the defendant was sentenced to not less than four years nor more than twenty years in the penitentiary. Defendant now appeals this conviction.

Defendant presents two contentions in this appeal: (1) he was denied his right to a speedy trial when the trial court improperly granted the

State's motion for an extension of time; (2) the prosecutor's closing argument to the jury included improper remarks which were so prejudicial as to deny the defendant a fair trial.

We affirm the conviction.

I.

We first consider defendant's contention that he was denied his right to a speedy trial. The speedy trial act (Ill. Rev. Stat. 1973, ch. 38, par. 103—5), provides in relevant part:

> "(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant.
>
> ✿ ✿ ✿
>
> (c) If the court determines that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day the court may continue the cause on application of the State for not more than an additional 60 days."

The defendant was arrested on May 28, 1974, and remained in custody until his trial on March 10, 1975. He answered ready and demanded trial on September 13, 1974, and the case was subsequently continued, either by motion of the State or by order of court, until January 10, 1975, the 119th day of defendant's term. On that day the State moved for a 60-day extension of time in which to try the defendant. Their petition alleged that King Ward and Tyrone Jones were material and essential witnesses, that due diligence had been exercised by the State in trying to produce them, and that there was good reason to believe that the witnesses could be produced at a later date. Defendant objected to an extension and denied the State's allegations. The State then presented evidence to support their allegations, in compliance with *People v. Bey* (1973), 12 Ill. App. 3d 256, 298 N.E.2d 184. Defendant's sole contention with respect to this issue is that the State did not establish that they had exercised due diligence in securing the presence of the witnesses within the 120-day term. We disagree.

At the hearing Michael Ficaro, an assistant State's attorney involved in the preparation of the case from its inception until January 7, 1975, testified as follows: King Ward had testified at the preliminary hearing and his testimony was the basis for the case being bound over to the grand jury. Both Ward and Tyrone Jones were occurrence witnesses. Up until January 6 or 7, 1975, Ficaro believed he had information as to their whereabouts and thus had no reason to believe that they would be unavailable on the trial date. The latter part of December 1974,

investigators had been assigned to locate several witnesses, including King Ward and Tyrone Jones. Ward and Jones had not yet been located.

Investigator Philip Ducar testified as follows: Two or three days after Christmas 1974, Ficaro asked him whether King Ward and Tyrone Jones would be available for trial. Ducar told him that they had been available previously; that they had "come down here" before, and he saw no reason why they would not be available in the future. A few days after New Year's Day he first learned that they could not be located. On the 5th or 6th of January 1975, Ducar went to Ward's address but found the family had moved; he traced Ward's mother through telephone records and she promised him she would get Ward's new address and telephone number; he tried to trace Ward through his place of work but the company had gone out of business; about an hour before the hearing Ward's mother told Ducar that Ward lived in the area of Quincy Avenue and Cicero. Ducar had also, on two occasions, gone to the area of Tyrone Jones' residence to try and locate Jones. He spent three or four hours looking on the day of the hearing and two or three hours earlier in the week, learning that area residents believed Tyrone Jones to be in the Army. Ducar had been told that efforts were under way to locate Tyrone Jones through Army authorities.

Investigator Russell McKibben, assigned to the case the day before the hearing, testified that he had just learned that the last name of Tyrone Jones was actually Barlow; that he believed he could find Tyrone Barlow, and that Mrs. Ward had told him that she expected to hear from King Ward on Saturday, the day after the hearing.

Defendant contends that a lack of diligence on the part of the State is established by the late date on which they made efforts to locate the two witnesses. In support of this defendant cites *People v. Shannon* (1975), 34 Ill. App. 3d 185, 340 N.E.2d 129. In that case the State was granted an extension of time on the final day of the four-month period. The appellate court reversed the defendant's subsequent conviction and ordered that he be discharged. But the case is clearly distinguishable on its facts. Two of the three witnesses involved in that case were policemen who were on vacation on the original final trial date. The State first tried to secure their appearance only four days before that date, even though the police vacation schedules were prepared fourteen months in advance. The third witness was not mentioned in the petition for an extension. The State first tried to locate him only six days before the trial date, even though the record showed that 2½ months before the trial date, the victim's wife had learned that this witness had gone to St. Louis. Unlike the case at bar, in *Shannon* there was evidence that the State had reason to know long before the trial date that their witnesses might not be available for trial.

■■ It is well settled that the power to grant an extension of the

120-day period is discretionary with the trial judge, and a reviewing court should not disturb that judgment unless there has been a clear abuse of that discretion. (*People v. Arndt* (1972), 50 Ill. 2d 390, 280 N.E.2d 230; *People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634.) The trial judge expressly found that the State had exercised due diligence in attempting to locate these witnesses, and that there was reason to believe that they could be located in the future. This finding was not an abuse of discretion, given the evidence outlined above.

Accordingly, we find that the extension granted was proper.

## II.

Defendant's second contention is that he was denied a fair trial by certain allegedly prejudicial remarks made by one of the prosecutors in his final argument.

In order to evaluate this claim it will be necessary to review the evidence adduced at trial in some detail. On January 25, 1974, Marvell Duckins was shot and killed by the defendant, James Watson. At trial the defendant sought to establish that the killing was in self-defense. The State presented four witnesses who were close friends of the deceased and who were standing on the corner with him when he was shot. They all testified that the defendant approached to within a few feet of Duckins and then, after a sentence or two of conversation, without provocation, the defendant drew a pistol and shot Duckins, when Duckins turned to light a cigarette.

Defendant testified as follows: two days before the shooting, the defendant had been beaten by Duckins and some of his friends. Defendant had won a pistol in a pool game about three months before the incident with Duckins. He had kept this gun in his house, taking it out only once to show to his brother-in-law. On January 25, 1974, at about 1 p.m. he went with two of his friends, Anthony Lyles and Ray McQueen, to the house of his sister, Mary Watson. Mary and his other sister, Georgina Watson, were there. Defendant had brought his gun and he showed it to Anthony Lyles, asking Lyles to keep it at his house. Lyles took the gun and put it on his person. Defendant then decided to go to the store to buy some diapers for his baby. He was accompanied by Anthony Lyles, Ray McQueen, Mary and Georgina Watson, and one John Avery. About half a block from the intersection where the deceased was standing, but before defendant realized that the deceased was there, Lyles returned the gun to the defendant. When the defendant approached the intersection where Duckins was standing, he was grabbed by Duckins and a companion. Duckins hit the defendant under the left eye with a bottle, gashing his face. The defendant fell and members of the crowd began "stomping" on him. Defendant, afraid that Duckins would stab him with the bottle and

kill him, pulled out his gun and fired twice from a seated position. He could not see who was stomping him and he did not see where he was shooting or whether he hit anyone. Defendant then fled. He was afraid that Duckins' friend would kill him if he remained in the area, so he went to Mississippi where he remained until he was arrested.

Cynthia Jones testified for the defense: At the time of the incident she was the girlfriend of the brother of defendant's friend, Ray McQueen, and she lived with Ray's sister. She saw Duckins, without provocation, strike the defendant with a broken bottle under the eye. The defendant fell to the ground and was kicked and hit by members of the group. The defendant then fired the two shots which struck Duckins.

Mary Watson, defendant's sister, testified she also saw Duckins strike the defendant with a broken bottle without provocation from the defendant. She then heard a shot. Georgina Watson, also defendant's sister, testified she saw Duckins hit the defendant and knock him to the ground, but she didn't see anything in Duckins' hand; defendant was hit and kicked while on the ground and then she heard a shot. Later she saw the defendant with a gash under his eye.

Anthony Lyles testified that he had grown up with the defendant and considered him his friend, but that he also was Duckins' friend. He saw the defendant walk up to Duckins, then heard a bottle break. The next thing he saw was the defendant on the ground, being kicked. He then heard two shots. Later he saw the defendant, who was bleeding from his left eye.

The State called Patricia Jones, a 17-year-old high school student, in rebuttal. She testified that at the time of the incident she was standing on the other side of the intersection. She saw a group of boys on the corner, heard a shot, and ran. She also stated that she saw nothing unusual while she was standing there. The court sustained objections to the following questions: whether she saw any fight, anyone jump on anybody, any bottle in anyone's hand, what was going on prior to hearing the shot, and whether anyone was lying in the street prior to the shot. After objections to all these questions were sustained, the State did not question her any further. On cross-examination she repeated that she heard a shot and then ran.

In their final argument the State commented on this line of questioning, and it is this commentary which the defendant asserts deprived him of a fair trial:

> "* * * And after the Defense had its case, we brought several witnesses back again in what we refer to as rebuttal, and in particular we brought the first witness a young lady by the name of Patricia Jones, she also related to you she was a student on the day in question, and she is still a student at Crane High School and she

didn't know anyone, she didn't know anyone of the Watsons, she didn't know any of Marvell's people, Bennie Jones or Tyrone Barlow or Ronald Harding, she didn't know any of those people all she said is she was standing on that corner with her girl friend looking north when she saw a group of boys on the other corner. What did she hear? She heard a shot. And what did she do? She ran. Now, we tried to ask her was there any blood—

MR. GEVIRTZ: Objection, objection to what he tried to ask her.

THE COURT: Well, as to what he tried to ask her the objection will be sustained.

MR. COLLINS: Well, I asked her was there a fight you saw happen—

MR. GEVIRTZ: Objection.

THE COURT: All right, Counsel, that is not evidence, the objection is sustained. Only comment on the evidence.

MR. COLLINS: You heard her testify and you saw what happened when we tried to ask her those questions.

MR. GEVIRTZ: Judge—

MR. COLLINS: — and remember she is independent—

MR. GEVIRTZ: Judge, I object for the record.

THE COURT: All right, Counsel, don't continue that line at this time.

MR. COLLINS: She is independent, she is just standing there, she is no one's friend, she knows no one—what better witness is there? I think she had a lot to say * * *."

As this excerpt shows, defendant's objections to this argument were sustained. Additionally, the jurors were instructed to disregard any argument not based on the evidence. Defendant's contention is that these remarks were so prejudicial that they could not be cured by sustaining objections to them or by proper instructions. He argues that the clear implication of this argument was that the defendant's lawyer was able to prevent the jury from hearing incriminating testimony by an independent witness, and that this could have influenced the jury in finding the defendant guilty of voluntary manslaughter rather than nót guilty by reason of self-defense.

■■ We agree that these remarks were clearly improper in that they were not based on the evidence. But as our supreme court has stated: "Where it appears that improper remarks do not constitute a material factor in the conviction, or that they are of such a minor character that prejudice to defendant is not their probable result, the verdict will not be disturbed." (*People v. Swets* (1962), 24 Ill. 2d 418, 423, 182 N.E.2d 150, 153; quoted in *People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363, 372.) Defendant's counsel immediately objected to these statements and

those objections were sustained. In his closing argument the defendant's counsel reminded the jury of the limited facts to which Patricia Jones testified. The trial court instructed the jury to disregard argument not based on the evidence. These factors limited the prejudicial effect of these improper remarks. (*People v. Daugherty* (1969), 43 Ill. 2d 251, 253 N.E.2d 389.) The State presented four witnesses who testified to an unprovoked attack on the part of the defendant. In the light of this testimony it is not reasonable to assume that the State's implications of possibly incriminating testimony by one additional witness could have affected the verdict, even where the State suggested, without evidentiary basis, that the witness was an independent one.

We also note that the defendant was convicted of voluntary manslaughter, not murder. This verdict was more reasonably supported by a belief on the part of the jury in defendant's version of the incident, especially when it is recalled that the defendant testified that he fired without knowing whether one of his immediate attackers was the deceased, and without looking where he was shooting.

We therefore find that these remarks, although improper, could not reasonably be said to have affected the verdict and therefore were not so prejudicial as to require a reversal.

The judgment of the trial court is affirmed.

Affirmed.

DIERINGER, P. J., and JOHNSON, J., concur.