THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOSE TORRES, Defendant-Appellant.

First District (3rd Division)    No. 62930

Opinion filed July 13, 1977.—Supplemental opinion filed on denial of rehearing
October 12, 1977.

James J. Doherty, Public Defender, of Chicago (Gail A. Moreland, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Larry L. Thompson, Lee T. Hettinger, and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

A jury found Jose Torres guilty of the murder of Sandra Jean Johnson and Rose Mary Brown; he was sentenced to serve 100-300 years on each offense, the sentences to run concurrently. On appeal Torres contends: (i) he was denied a fair trial by the State's reference to conversations and prior statements designed to improperly bolster a weak witness, by the State's asking a police officer for disclosure of a statement the witness made implicating defendant, by the prosecutor's closing argument and by police testimony insinuating defendant was a fugitive; (ii) he was not proved guilty beyond a reasonable doubt; (iii) he was deprived of a fair trial when a police officer referred to defendant's arrest record; (iv) the court erred in admitting photographs of one of the victims; (v) the court precluded defendant from presenting his theory of defense by refusing to call a person as a court's witness; and (vi) he was denied his right to a speedy trial. We reject these contentions and affirm the judgment.

The State's key witness, Peter Gonzalez, testified that defendant shot the women, and Torres testified Gonzalez did the shooting. The only significant issue for the jury to resolve was who was telling the truth.

On the evening of the murders, September 2, 1973, Gonzalez, who was then 16 years old, and Torres were driving around the Rush Street area in Chicago in a car Torres borrowed from a friend. They picked up the two victims, who offered to perform sexual acts for money, and drove to a beach area off Lake Shore Drive where, according to Gonzalez, Torres parked the car. Gonzalez also testified that after Torres and Sandra Johnson left the car and were gone several minutes, Gonzalez heard a noise like a gunshot. Torres returned to the car alone, telling Gonzalez and Rose Mary Brown that Sandra Johnson had taken a taxi home. Rose Mary Brown asked to be let out, and as soon as she was out of the car, Torres shot her in the back of her head. According to Gonzalez, that was the first time he knew that Torres had a gun. Gonzalez also testified that Torres told him he had shot Sandra Johnson. Torres' account was similar to Gonzalez's, except he testified that he remained in the car while Gonzalez left the car with Sandra Johnson, and that Gonzalez shot both women.

Gonzalez also testified that on the evening of the murders, he and his roommate, Pablo Alavarez, were sitting on the stoop in front of their

building when Torres approached them. Torres took Alvarez aside and talked to him, and Torres and Alvarez then went upstairs. When Torres returned, Harry Hernandez loaned Torres his car and Torres and Gonzalez drove off, subsequently picking up the two women.

Gonzalez testified that after the murders Torres gave the gun and car keys to him, telling him to return them to the owners. He returned the keys to Hernandez and put the gun away in his apartment early the morning of September 3. Later that day, Gonzalez told Hernandez what happened, and the next day, September 4, he told Alvarez what happened, but his testimony did not include what he told them. Gonzalez also testified that subsequent to the murders and prior to his arrest, he had conversations with James Bosques and his brother, Olvin Bosques, friends of his who both were witnesses. He did not testify to what was said in those conversations either.

Gonzalez was arrested on September 11 and charged in juvenile petitions with both murders. He made a statement to the police and to an assistant State's attorney who told Gonzalez that if he testified, no charges would be pressed against him. Gonzalez admitted that promises were made to him for his testimony, but he did not remember when, where or by whom. Gonzalez did not remember if the juvenile charges against him were dropped, but he recalled that he did not return to juvenile court on those charges.

Alvarez testified that on the evening of September 2, he and Gonzalez were outside their apartment when Torres walked over and asked him if he could borrow his gun. He and Torres went upstairs while Gonzalez remained outside, and Alvarez gave Torres the gun. Gonzalez returned the gun about 4 a.m. on September 3, and Alvarez noted it had been fired. That evening Olvin Bosques, owner of the gun, came to Alvarez's apartment and took his gun. Over objection, Alvarez testified to talking with Gonzalez on September 4, 1973, after Gonzalez showed him a Sun-Times newspaper article. After Alvarez read the article, he and Gonzalez met Olvin Bosques and his brother, James, at Olvin's store. Alvarez testified that he showed the newspaper article to Olvin and conversed with him, and Olvin Bosques then returned the gun to Alvarez. Alvarez immediately gave the gun to James Bosques, and he and Gonzalez left the store. Alvarez next saw the gun at James Bosques' garage on September 11, the day Gonzalez was arrested. Also present in the garage at the time were James Bosques; Olvin's wife, Susan Bosques; and Freddie Mercado, who took the gun.

Olvin Bosques testifed he had loaned the gun, which the evidence established was used in the murders, to Alvarez. On September 3, 1973, he went to Alvarez's apartment to get the gun and noticed a couple of

shells were missing. The next day, Gonzalez and Alvarez came to his store while his brother James was there. They showed James and him a Sun-Times newspaper account of the murders and James took the gun.

James Bosques testified that on September 4, he saw the gun at his brother's store, and, after a conversation with Gonzalez and Alvarez, took the gun to his garage. On September 11, he, Susan Bosques, Alvarez and Mercado decided to get rid of the gun. Mercado took the gun and James did not see it again. Susan Bosques' testimony corroborated James Bosques'.

Although the record does not show how police investigator Samuel Greiner came in contact with Mercado, Greiner testified he met Mercado on September 18 at the Grand Avenue bridge over the Chicago River. He instructed Mercado to throw a rock into the river similar in size and weight to the .25-caliber automatic which he had thrown into the river and in the same location as he had thrown the gun. Mercado picked up a rock and threw it into the river in an area from which the gun was recovered the next day by a scuba diver. Ballistics testimony established that it was the murder weapon.

Police investigator Thomas Skelly testified that on September 11, he saw a 1967 purple Nova thought to have been used the night of the murders and stopped Hernandez as he was entering it. After his talk with Hernandez, the police began looking for Torres and Gonzalez. Gonzalez was found and arrested for the murders. Skelly and police investigator John Durkin testified that commencing September 11 they talked to Torres' mother, to Hernandez and to a few other friends of Torres. The investigators inquired whether these people knew where Torres was, and asked that they contact the police if they learned where he was. Neither officer testified as to what response he received from these individuals.

Skelly and police officer Richard Morask testified that following a lead, they found defendant's wife and another woman at an apartment on the morning of September 28. Although both women said defendant was not present, upon searching the apartment, the police found Torres hiding inside a refrigerator.

A secretary employed by Ludwig Drum Company testified Torres was employed on September 10, began work on September 11, never returned to work thereafter, and never picked up his pay check for the 8 hours he worked on September 11.

Torres testified he first saw the gun when Gonzalez shot Rose Mary Brown, and that Gonzalez told him he shot Sandra Johnson after leaving the car with her. As they were leaving the scene, Gonzalez told him he shot Rose Mary Brown because he had already killed Sandra Johnson and might as well kill them both. He also stated Gonzalez told him he had learned from Sandra Johnson that the women had friends, who intended to rob Gonzalez and Torres, following them in a car.

Torres also testified there was an outstanding warrant for his arrest around September 10 for possession of marijuana, and he was avoiding service of that warrant until he employed an attorney. His explanation for hiding in the refrigerator was that he thought the police were attempting to arrest him on the marijuana charge, and since he had just been married, he did not want to leave his wife. He admitted knowing of Gonzalez's arrest and working for Ludwig on September 11, but claimed Gonzalez was not arrested on the day he worked for Ludwig.

Lloyd Ware, a witness subpoenaed by the defense, failed to respond to the subpoena and a bench warrant was issued for his arrest. Defense counsel asked the court to call Ware as a hostile witness since he was unwilling to vouch for Ware's veracity and to enable defendant to impeach Ware through Ware's prior inconsistent statements to the police. Defense counsel contended that Ware's testimony would expose a scheme in which the victims would pose as prostitutes and be picked up by men in a car, with Ware and his friends following the car and then robbing the men. The defense contended that Ware's testimony corroborated defendant's testimony that Gonzalez had told him he killed Sandra Johnson because he learned of this plan. Torres argues that the court's refusal to call Ware as a court's witness denied him a proper opportunity to present his defense.

■■ The State maintains that because Torres failed to set forth in his motion for a new trial that evidence of the conversations involving Gonzalez and others and reference to statements Gonzales made were improperly admitted at trial, Torres has waived that issue for review. (*People v. Hairston* (1970), 46 Ill. 2d 348, 367, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972.) Although failure to raise an issue in a written motion for a new trial waives that issue, under the plain error rule (Supreme Court Rule 615(a)), a reviewing court may consider errors not properly preserved for review when the evidence in a criminal case is closely balanced. *People v. Pickett* (1973), 54 Ill. 2d 280, 283, 296 N.E.2d 856.

Defendant concedes that the substance of the conversations between Gonzalez and Hernandez, Alvarez, James Bosques and Olvin Bosques which occurred after the murders was not introduced and, therefore, testimony relating to these conversations presents no hearsay problem. Defendant insists, however, that introduction of evidence of those conversations created a prejudicial pattern of conduct which improperly corroborated Gonzalez's in-court testimony. The State responds that the evidence was introduced only to show that after the conversations took place the witnesses hid and eventually disposed of the gun which proved to be the one used in the murders.

■■ Evidence that the witnesses had the gun was relevant to show that the gun recovered by the police was the one Alvarez testified he loaned to Torres the night of the murders. This testimony was properly admitted to

establish a "chain of custody" linking the defendant to the gun and showing that the defendant had access to the same gun at the time of the murders. Defendant claims that this was unnecessary evidence which duplicated the ballistics testimony and was introduced only to prejudice the jury. That testimony, however, showed only that the gun was used in the murders, but it could not and did not prove that the gun was the one Alvarez loaned to the defendant. Evidence, therefore, that conversations occurred which explain the movement of the gun from Alvarez to the defendant, then to Gonzalez who returned it to Alvarez, followed by its delivery to Olvin Bosques and James Bosques and then into the hands of Mercado and its eventual recovery from the river, was properly admitted.

■■ Defendant also objects to the propriety of permitting Gonzalez on redirect examination to refer to his prior statements and testify that in them he had named Torres as the murderer. Defendant's claim is that this permitted the State to bolster Gonzalez's testimony at trial. On cross-examination, the defense attempted to impeach Gonzalez by showing that facts he testified to at the trial were not included either in statements he previously had made to the police, or in his preliminary-hearing testimony. By establishing that Gonzalez did not make as complete a statement to the police as he did while testifying at trial, defense counsel implied a recent fabrication by Gonzalez. Recent fabrication is sometimes developed by showing that a witness did not mention part of his trial testimony earlier when he made statements and when it would have been natural for him to speak of the additional testimony he later gave at trial. His silence prior to trial is then presented as a self-contradiction of his testimony at trial. It is permissible to rehabilitate such a witness by showing that his prior statements were consistent with his other testimony at the trial. (Fed. R. Evid. 801(d)(1)(B); 4 Wigmore, Evidence §1129, at 270-72 (Chadbourn rev. ed. 1972).) Prior consistent statements are introduced to show that in other aspects, the witness' testimony at trial is consistent with his prior statements. In view of the cross-examination which Gonzalez received, evidence that his prior statements were consistent was properly admitted on redirect.

■■ Although he did not object at the time, defendant now contends he was prejudiced by the reference in the assistant State's attorney's closing argument to the consistency between Gonzalez's statements prior to trial and his trial testimony. The closing argument was based on Gonzalez's redirect testimony, which we already have concluded was properly in evidence. It was also based on Gonzalez's statement to the police which was in evidence, and on the cross-examination of Olvin and James Bosques and Alvarez, which brought out that they too had given statements to the police. With the record showing these statements

existed, it was not improper for the prosecutor to comment that if any of these written statements or the cross-examination of Gonzalez and the other witnesses developed anything inconsistent with Gonzalez's testimony at trial, defense counsel would have called the contradiction to the jury's attention. The prosecutor's closing argument was permissible because it was based on facts in evidence and reasonable inferences from those facts. *People v. Wright* (1974), 56 Ill. 2d 523, 531, 309 N.E.2d 537.

■■ Defendant also urges that it was error to deny his motion for a new trial when on redirect examination the prosecutor asked Police investigator Skelly the following question about a written statement Gonzalez gave to the police: "In that statement he [Gonzalez] named Mr. Torres as the man who shot these two girls, didn't he?" Defendant immediately objected to the question, the objection was sustained and the question never was answered. Unlike *Bruton v. United States* (1968), 391 U.S. 123, 128, 20 L. Ed. 2d 476, 481, 88 S. Ct. 1620, where a codefendant's confession implicating the defendant was held not to have been cured by a limiting instruction, Officer Skelly never answered the question. Consequently, no prejudicial hearsay testimony was presented to the jury. Although the question was improper, it does not justify reversal.

■■ Defendant also argues he was prejudiced by inadmissible testimony of police officers Durkin and Skelly that they had talked with Torres' friends, neighbors and relatives and inquired about Torres' whereabouts following Gonzalez's arrest. Defendant contends that this was an attempt to create the impression that Torres was a fugitive. None of these individuals testified, and defendant contends that no foundation was laid demonstrating that they saw Torres often, but did not see him between Gonzalez's arrest and his arrest. The State responds that the testimony was properly introduced as evidence that Torres was aware that he was a suspect and fled, pointing out that only if a defendant knows of the crime and that he is a suspect can an inference of guilt be drawn from flight. (*People v. Reyes* (1970), 131 Ill. App. 2d 134, 139, 266 N.E.2d 539.) To prove flight, evidence that defendant was aware that he was a suspect is essential. (*People v. Herbert* (1935), 361 Ill. 64, 73-74, 196 N.E. 821.) The admission of evidence that the police talked to Torres' friends and relatives did not require a showing that these individuals then talked to or saw the defendant. The fact that they did not testify whether they saw the defendant goes only to the weight of the evidence concerning flight. Moreover, the testimony of the police officers regarding their interviews with Torres' friends and relatives was not prejudicial given the other evidence of flight, that is, Torres' failure to return to work at Ludwig Drum Co. or pick up his check for the 1 day he worked, and his attempt to elude the police by hiding in a refrigerator.

■■■ Defendant's argument that he was not proven guilty beyond a

reasonable doubt is based primarily on the inherently suspect nature of the single eye-witness testimony of an accomplice given full immunity in exchange for the testimony. (*People v. Mostafa* (1971), 5 Ill. App. 3d 158, 176, 274 N.E.2d 846.) In a recent case, the supreme court has reaffirmed that uncorroborated accomplice testimony is sufficient ground for conviction, although in reversing the conviction, the court cautioned that such testimony should be carefully scrutinized. (*People v. Wilson*, (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291.) The court recognized that "whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury or the court." (66 Ill. 2d 346, 349.) In this case, the jury observed the demeanor of both Gonzalez and Torres, listened to their contradictory stories and decided which one was telling the truth. In addition, the jury had the opportunity to balance Alvarez's testimony that the defendant borrowed the gun on the evening of the murders against Torres' testimony that he did not see the gun until Gonzalez shot Rose Mary Brown. The jury also had evidence of Torres' flight after Gonzalez's arrest. In *Wilson*, the victim of a robbery was unable to identify the defendant in the lineup and identified another man three times, and the accomplice whose testimony convicted the defendant admitted that he had initiated the plan for the robbery by choosing the victim. Here, Gonzalez was the only witness in a position to testify that Torres was the murderer, and supported by the other evidence is testimony was credible.

■■■ Next, Officer Skelly's reference to defendant's arrest record is claimed to be prejudicial error. This subject arose during Skelly's cross-examination, when he was asked by defense counsel if he knew there was an outstanding arrest warrant against Torres around the time of the murders for possession of marijuana. When asked on redirect by the assistant State's attorney whether there was an outstanding arrest warrant for defendant, Officer Skelly commented, "My recollection on his arrest record which we requested and got * * *." At this point, Officer Skelly's answer was interrupted by an objection of defense counsel and a request for a mistrial. No further reference was made to Torres' arrest record. Part of the defense strategy was that the warrant for defendant's arrest on the marijuana charge explained his flight. The question put to Officer Skelly on redirect was justified by the line of questioning begun by the defense. (*People v. George* (1971), 49 Ill. 2d 372, 379, 274 N.E.2d 26; *People v. Briggman* (1974), 21 Ill. App. 3d 747, 753-54, 316 N.E.2d 121.) The witness' response, apparently inadvertent and quickly cut off by defense counsel, was not prejudicial particularly because the witness did not have the opportunity to testify to any specific prior arrests.

Defendant claims that he was prejudiced by the introduction of

suggestive photographs of Sandra Jean Johnson taken at the scene of her murder, arguing these photographs were inflammatory and cumulative, and contributed to the guilty verdict. Defendant argues no proper purpose was shown for the introduction of the photographs, they had no probative value and their usefulness was outweighed by their prejudicial nature.

■■ The photographs showed the murder scene and the corpse viewed by the officers who discovered it. They revealed that the victim was dead, always a fact in issue in a murder case. They also established the identity of the deceased, and corroborated the testimony of police officers who discovered the body. One of the photographs tended to prove the cause of death by showing that a shell casing was found near the body. Even gruesome photographs may be admitted to establish any fact in issue. (*People v. Speck* (1968), 41 Ill. 2d 177, 202, 242 N.E.2d 208.) In *Speck*, photographs of the murder victims were held admissible to show the amount of force used, despite the defendant's willingness to stipulate to the cause of death and the identity of the victims. The admissibility of photographs of a person who has been murdered is within the discretion of the trial court. (*People v. Smith* (1974), 20 Ill. App. 3d 756, 760, 314 N.E.2d 543.) The photographs in this case were introduced during the trial when the burden was on the State to prove the identity of the victim, the fact of death and the cause of death. It was not an abuse of discretion to allow their introduction. Moreover, their introduction did not have any bearing on the jury's evaluation of whether Torres or Gonzalez was to be believed.

■■ Nor did the court err in refusing to call Lloyd Ware as a court's witness. In deciding whether to call a person as a court's witness, a court usually considers whether the party seeking the witness' testimony cannot vouch for the witness' veracity (*People v. Dennis* (1970), 47 Ill. 2d 120, 132, 265 N.E.2d 385, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2212), and whether the cross-examination of the witness will relate to material, noncollateral matters. (*People v. McKee* (1968), 39 Ill. 2d 265, 270, 235 N.E.2d 625.) In his offer of proof, defense counsel stated that Ware's failure to appear in response to a subpoena proved his inability to vouch for Ware's veracity. However, after Ware was arrested for his failure to heed summons, and placed on an individual recognizance bond, he appeared in court at least twice when the defense requested his presence. Defendant's offer of proof consisted of a police report summarizing a statement to the police by Ware's friend, Gage, regarding a plan to have the women act as prostitutes and then rob their "customers" and escape with Ware and Gage, and a further observation in the police report that Ware said substantially the same thing. Defendant argued that this testimony would corroborate Torres' testimony that Gonzalez said he

killed the women because he learned of their plan to rob them. Even conceding everything defendant argues, there is nothing in Ware's testimony to shed light on whether Torres or Gonzalez murdered the women. Ware did not observe the murders; at best, his testimony could establish a motive for the murders, a motive equally applicable to Torres or Gonzalez. Since Ware's testimony would be to a collateral matter, it was not necessary for the court to call him as a witness. (*People v. McKee* (1968), 39 Ill. 265, 270.) Calling a court's witness is a matter within the trial court's discretion. (*People v. Robinson* (1974), 21 Ill. App. 3d 343, 346, 315 N.E.2d 95.) Under these circumstances where an eyewitness account by Ware is not involved and his testimony would be to a collateral matter rather than the direct issue of guilt, the court did not abuse its discretion.

On January 6, 1975, the day the term expired, the State filed a motion for an extension of time in which to bring defendant to trial. The grounds were that certain material witnesses had not been located although due diligence was exercised to find them.

After being assigned on December 30, 1974, police investigator Russell McKibben visited the last-known addresses of all the witnesses, each of whom had appeared at the preliminary hearing and given their addresses to the court. McKibben testified he was to serve subpoenas on Hernandez, Mercado, Alvarez, James Bosques and Olvin Bosques. Olvin Bosques was in the hospital according to his wife, Susan, but the police were unable to contact him. None of the other parties were at the addresses listed on the subpoenas. McKibben learned Mercado had a new address, but was unable to serve him prior to January 6. McKibben spoke with people in the area where the subpoena indicated Hernandez lived, and contacted the Chicago Police Department Tactical Unit for assistance. He testified he learned of a possible address for Hernandez, but at the time of the hearing McKibben could not substantiate that he was there. Although unable to locate James Bosques, McKibben testified that he had spoken with his wife, who promised she would try to locate him and notify the police. McKibben stated that after visiting addresses given at the preliminary hearing and questioning neighbors, given additional time it was his opinion he could locate the witnesses except for Alvarez. On this testimony, the court granted a 60-day continuance, and the trial began on February 25, 1975.

Section 103—5 of the Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, par. 103—5) authorizes a continuance on the application of the State if the State has exercised without success due diligence to obtain evidence material to the case and there are reasonable grounds to believe that such evidence may be obtained later.

An extension of the 120-day period to enable the State to obtain material evidence is discretionary with the trial court, and will not be

disturbed by a reviewing court unless there has been a clear abuse of discretion. (*People v. Arndt* (1972), 50 Ill. 2d 390, 393, 280 N.E.2d 230; *People v. Watson* (1977), 47 Ill. App. 3d 665, 667-68, 365 N.E.2d 95.) Defendant relies on *People v. Shannon* (1975), 34 Ill. App. 3d 185, 340 N.E.2d 129. The court in that case reversed a conviction because the State had not exercised due diligence in its efforts to locate two policemen vacationing when the case was called for trial. In *Shannon*, the State could have arranged for their availability long before the running of the term because the police vacation schedules were prepared 14 months in advance. Yet, the State there first tried to locate the witnesses only 4 days prior to the last day of the term.

■■ Here, the prosecution had no reason to suspect the witnesses would be unavailable. All of them had appeared previously at the preliminary hearing and stated where they lived at that time. The attempts by the police to locate the witnesses are strikingly similar to the situation in *Watson*, where a continuance was held to be proper and where *Shannon* was similarly distinguished. (*People v. Watson* (1977), 47 Ill. App. 3d 665, 365 N.E.2d 95.) Unlike *Shannon*, where it was evident to the State that the two witnesses would be on vacation at the trial date, the State had no reason to suspect in this case that the witnesses would have all relocated since the time of the preliminary hearing. Faced with the problem of missing witnesses, the State was diligent in trying to locate them before the end of the term. Based on McKibben's testimony that he believed the witnesses could be located, the court did not abuse its discretion in granting the continuance.

Judgment affirmed.

McNAMARA and JIGANTI, JJ., concur.

SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:
The defendant complains in his petition for rehearing that the opinion failed to discuss three of the arguments he advanced. Also, relying on *People v. Suggs* (1977), 50 Ill. App. 3d 778, 365 N.E.2d 1118, filed 2 days prior to the opinion in this case, defendant urges the court to conclude that Gonzalez was improperly rehabilitated through the use of prior consistent statements.

■■ Defendant argues that he was deprived of a speedy trial because in receiving an extension of the 120-day term to locate witnesses, the State failed to establish that the witnesses were material.

One of the missing witnesses was Alverez, and defendant

acknowledges his counsel conceded that Alverez was material. The police investigator searching for the other witnesses testified he believed they might lead him to Alverez, and this testimony showed the other witnesses also were material. While defendant complains the investigator was prompted to make this statement when he was asked the same question three times at the hearing on the State's application for an extension, it is significant that the investigator did find Alvarez, who then testified at trial.

■■ Moreover, the record of proceedings reveals that defense counsel indicated he would not require a showing of the materiality of the other witnesses. The colloquy concerning them was:

"The Court: State, you are alleging that they are material and essential.

Assistant State's Attorney: Yes. If Counsel would like, I will get—

Defense Counsel: I hate to take the Court's time. * * *"

As we interpret this colloquy, defense counsel cut off the prosecutor from presenting evidence of the materiality of the witnesses with his apology that he did not want to take the court's time; defendant should not now be entitled to complain of that which his counsel brought about. More important, however, the State easily could have established the materiality of the witnesses who were the subject of the search—Alvarez, Hernandez, James Bosques, Olvin Bosques and Mercado. All of them, except Mercado and Hernandez, were witnesses at the trial, and the opinion previously filed in this case demonstrates how material their testimony was, as well as how material the testimony of Mercado would have been.

Second, defendant argues that the court's opinion did not respond to his contention that photographs of one of the victims should have been excluded as suggestive of rape. The defendant did not object at trial to the admission of the photographs on this specific ground; his only objection was that they were inflammatory and prejudicial. In any event, we believe the photographs had the probative value described in the opinion, and were more demonstrative of murder than of rape. Based on the principles of law cited in the opinion and acknowledged by the defendant in his petition for rehearing, the trial judge did not abuse his discretion in admitting the photographs.

■■ Defendant's final contention regarding points not discussed in the opinion relates to an argument made for the first time in a footnote at the end of his brief under a heading entitled, "Summary." In discussing conversations the investigators had with various people while searching for Torres, the prosecutor argued to the jury:

"They are looking all over this area trying to find Jose Torres.

You didn't hear what they told them because all the questions were objected to, they are not telling the police anything."

The prosecutor's statement was not objected to at the trial; consequently, the defendant has waived any objection he might have to it. In any event, the statement was not prejudicial, for it implied neither that the defense concealed evidence favorable to the State, as the defendant argues in his petition, nor that matters not in evidence would have been favorable to the prosecution, as defendant argued in his principal brief. The prosecutor's statement was not comparable to the prosecutor's conduct in *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402, with which defendant tries to equate it. In *Hovanec*, the objectionable statement was repeated several times over the defendant's objection, which the trial judge consistently sustained.

The three objections reviewed above do not justify a rehearing.

Further, we have reviewed *People v. Suggs* and concluded that it is not inconsistent with the opinion in this case. Suggs' conviction was reversed primarily because the prosecutor in that case improperly emphasized defendant's post-arrest custodial silence. The *Suggs* opinion characterized the use of prior statements to rehabilitate a witness as being only one of two additional areas of prosecutorial misconduct, and pointed out that the use of the prior statements only "cumulated" with the other errors to deny Suggs a fair trial.

*Suggs* is distinguishable for another reason. There, it was the prosecutor who first called attention to "defense counsel's possession of potentially impeaching witness' statements," and then commented "that the lack of impeachment from those documents proved that the statements were corroborative of the witness' testimony." In the Torres trial, though, the crucial question the prosecutor put to Gonzalez referred to the prior statements about which defense counsel already had cross-examined Gonzalez. The prosecutor's question limited the inquiry to the prior statements which had been referred to in that cross-examination. On his cross-examination, defense counsel brought out that Gonzalez's prior statements to the police did not include details which he testified to on his direct examination. The response elicited in the redirect examination, that in his prior statements Gonzalez has asserted Torres was the murderer, demonstated that Gonzalez's direct testimony was consistent with his prior statements. This redirect testimony, then, properly rebutted the inference that Gonzalez had recently fabricated the details which were included in his direct examination, but omitted from his prior statements. The *Suggs* opinion does not support the contention that the testimony of Gonzalez was improperly bolstered upon his redirect examination.

Defendant also contends, relying on 4 Wigmore, Evidence §1128, at 270

(Chadbourn rev. 1972), that an accomplice cannot be rehabilitated by evidence of prior consistent statements. The State responds by contending that Wigmore states that even an accomplice can be rehabilitated by prior consistent statements when the basis of impeachment is recent contrivance.

We need not resolve the meaning of Wigmore's statements on this subject, however, because our opinion did not conclude that Gonzalez was an accomplice. Our references to *Mostafa* and *Wilson* merely pointed out that since even uncorroborated accomplice testimony is a sufficient ground to warrant a conviction, Gonzalez's testimony in this case was, if believed by the jury, enough to convict Torres.

The petition for rehearing is, therefore, denied.

McNAMARA and JIGANTI, JJ., concur.